The LITTLE HOCKING WATER
ASSOCIATION, INC.,
Plaintiff,

v.

E.I. DU PONT DE NEMOURS AND
COMPANY, Defendant.

Case No. 2:09–CV–1081.

United States District Court,
S.D. Ohio,
Eastern Division.

Signed March 10, 2015.

Dennis David Altman, Amy Marie Hartford, Amy Jo Leonard, Robin A. Burgess, Justin Derek Newman, Patrick Laughlin Brown, D. David Altman Co., L.P.A., Cincinnati, OH, for Plaintiff.

Eric E. Kinder, Clifford F. Kinney, Jr., Niall A. Paul, Spilman Thomas & Battle, PLLC, Charleston, WV, Aaron Todd Brogdon, C. Craig Woods, Vincent Atriano, Squire Patton Boggs (U.S.) LLP, Columbus, OH, Anthony Fitzmichael Cavanaugh, Gary Timothy Lombardo, Libretta Porta Stennes, Steptoe & Johnson LLP, Michael W. Steinberg, Morgan, Lewis & Bockius LLP, Washington, DC, Margaret C. Coppley, Nathan B. Atkinson, Spilman Thomas & Battle, PLLC, Winston–Salem, NC, Spilman Thomas & Battle, PLLC, Charleston, WV, for Defendant.

## OPINION & ORDER

ALGENON L. MARBLEY, District Judge.

### I. INTRODUCTION

This matter comes before this Court on Defendant's motions to exclude the testi-

mony and opinions of the following Plaintiff's expert witnesses: Michael Kavanaugh, Ph.D. (Doc. 340); Dr. Franklin W. Schwartz, Ph.D. (Doc. 341); Shira Kramer, Ph.D. (Doc. 342); Kurunthachalam Kannan, Ph.D. (Doc. 343); Margi Peden–Adams, Ph.D. (Doc. 344); and, Staci Simonich, Ph.D. (Doc. 347). Defendant requests a hearing as to all six motions to exclude. After a thorough review of the briefing, this Court holds that a hearing is not necessary for any of the motions. For the reasons set forth herein, Defendant's Motion to Exclude Dr. Kramer is **GRANTED**; Defendant's Motions to Exclude Dr. Kavanaugh, Dr. Kannan, and Dr. Peden–Adams are **GRANTED** in part and **DENIED** in part; and, Defendant's Motions to Exclude Dr. Schwartz and Dr. Simonich are **DENIED.**

## II. BACKGROUND

Because the factual and procedural background was briefed at length in this Court's Summary Judgment Opinion & Order, this Court will provide only a brief background. (Doc. 439). Plaintiff brings this action under the Resources Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B) and Ohio common law and statutory law, claiming Defendant's waste disposal practices have caused imminent and substantial harm to health and the environment, and caused it tort-related injuries. Plaintiff is a non-profit public water provider whose business is to provide potable water to approximately 12,000 people in ten different townships in southeast Ohio. Defendant owns and operates the Washington Works Facility (the "Facility") in West Virginia, approximately 1,300 feet down river from Plaintiff's Wellfield.

Little Hocking alleges that its Wellfield, which consist of approximately forty-five (45) acres of land as well as the soil and groundwater beneath the land, has been contaminated by DuPont. The alleged hazardous wastes are PFOA (perfluorooctanoic acid), also known as C8, and other PFCs (perfluorinated compounds), which have shorter and longer carbon chains than PFOA or C8 but have similar properties. These allegedly hazardous wastes were used in the manufacture of Defendant's Teflon® related products. *Id.* at ¶¶ 44, 46. Defendant has used C8 in its manufacturing processes from 1951 until it was phased out completely in June 2013.

Defendant does not contest the fact that it released C8 onto the environment or the amount of C8 it released. Defendant does contest whether multiple pathways of migration of C8 from the Facility to the Wellfield exist. While it concedes that C8 was transported via air emissions from DuPont's stacks by wind, and was deposited on the Wellfield, it believes that groundwater modeling shows no current groundwater pathway exits beneath the Ohio River to the Little Hocking Wellfield.

In late 2007, DuPont completed construction of a granular activated carbon filtration ("GAC") facility to treat Little Hocking's water that it distributes to its customers. Under an Administrative Order on Consent ("AOC"), Defendant must maintain the GAC pursuant to EPA guidelines. Other than building the GAC, Defendant has not performed any other remediation or clean-up of Plaintiff's Wellfield.

On March 10, 2015, this Court granted Defendant's Motion for Summary Judgment on Counts V (Abnormally Dangerous or Ultrahazardous Activity), VII (Unjust Enrichment), and VIII (Declaratory Judgment for Indemnity), and **DENIED** it on Counts I through IV (RCRA, 42 U.S.C. § 6972; Public and Private Nuisance; Negligence; Trespass) and VI (Conversion); additionally, this Court granted

Plaintiff's Motion for Partial Summary Judgment (Trespass, Conversion). (Doc. 439).

## III. LEGAL STANDARD

Under Rule 702 [1], an expert's opinion is admissible, by the discretion of the trial court, if: (1) the expert is qualified as such by knowledge, skill, experience, training, or education; (2) the testimony is relevant, meaning it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony is reliable, meaning it is based on sufficient facts or data, is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir.2008).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that while the evaluation of expert testimony is generally left to juries, district courts must serve in a "gatekeeping" capacity, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597–98, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* set forth a nonexclusive check-list for assessing the reliability of a scientific expert's testimony: (1) whether the theory or methodology has been or can be tested; (2) whether it has been subjected to peer review; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted in the scientific community. *Id.* at 593–94, 113 S.Ct. 2786.

In *Kumho Tire Co. v. Carmichael*, the Supreme Court clarified that the reliability inquiry *Daubert* outlined covers not just scientific testimony, but also expert testimony based on—in the language of Rule 702—"technical" and "other specialized knowledge." 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In *Kumho* the Supreme Court also recognized, however, that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167; *see Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir.2001) (explaining that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of reliability of expert testimony").

■ This Circuit has held that an expert must utilize in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir.2009) (internal quotation marks omitted). Determining the admissibility of expert testimony pursuant to Rule 702, however, entails a flexible inquiry. *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. The burden on a party proffering expert testimony is to "show by a preponderance of proof that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir.2008) (citing *Pride v. BIC*

---

**1.** "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Corp.*, 218 F.3d 566, 578 (6th Cir.2000)) (internal quotation marks omitted).

■ The requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation— i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Stuckey v. Online Res. Corp.*, No. 2:08–CV–1188, 2012 WL 1808943, at *4 (S.D.Ohio May 17, 2012) (Marbley, J) (citing *In re Scrap Metal*, 527 F.3d at 529– 30). Where the reliability of the evidence is in dispute, it is more appropriate for a judge to admit the evidence than to keep it from the fact-finder because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. Additionally, if the evidence is deemed admissible by a court, but it is ultimately found "insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment." *Id.; see* Fed.R.Civ.P. 50.

## IV. ANALYSIS

### A. Motion to Exclude Dr. Michael Kavanaugh

Plaintiff's expert, Dr. Michael Kavanaugh, is a research economist who claims to be an expert in the economic aspects of environmental enforcement, as well as to be experienced in valuing damages. Defendant does not challenge Dr. Kavanaugh's qualification to render the opinions included in his report, but only their relia-

bility and relevance. Defendant argues that Dr. Kavanaugh's following three opinions are inadmissible pursuant to Federal Rules of Evidence 103(d), 401, 402, and 702:

(1) Any opinions concerning the alleged cost-savings to DuPont from starting to build the granulated activated carbon Facility (GAC) in 2005 instead of 1985 or 1996.

(2) Any opinions concerning theoretical principles for calculations of Little Hocking's alleged averting behavior, or, more clearly stated, the resource allocation responses Little Hocking made directly by its personnel and indirectly through non-litigation consultants to the contamination its Wellfield; and

(3) Any opinions concerning the alleged need for DuPont to provide an "evergreen letter of credit" in the amount of any ongoing and/or future remedies ordered by the Court.

### 1. Cost-savings Opinion

First, Defendant asserts that Dr. Kavanaugh's opinion concerning cost-savings to DuPont as a result of delaying construction of the GAC are irrelevant because such an opinion strictly goes to Plaintiff's unjust enrichment claim (Count VII), which must fail as a matter of law. In the Summary Judgment Opinion and Order, this Court granted Defendant's Motion for Summary Judgment on Court VII, unjust enrichment. (Doc. 439). Accordingly, Dr. Kavanaugh's opinion relating to unjust cost-savings to DuPont as a result of delaying construction of the GAC—including opinions regarding when DuPont should have investigated constructing a GAC Facility—is irrelevant and inadmissible.

### 2. Averting Behavior Opinion

■ Second, Defendant argues that Dr. Kavanaugh's opinions regarding Plaintiff's

averting behavior in response to potential health or safety risks posed by the C8 contamination on its Wellfield, and how to translate such behavior into damages, are irrelevant because they do not assist a trier of fact.[2] In his report, Dr. Kavanaugh provides only an illustration and opinion of the principles he would use to determine the total cost of Little Hocking's alleged averting behavior for personnel, miscellaneous, goods and services, and technical consultants, along with a few, select calculations as examples for the reader. Dr. Kavanaugh failed, however, actually to calculate the value of such averting behavior. Indeed, he was not asked to perform such a calculation, but only to characterize the value of expenditures Little Hocking made in response to the contamination, and provide an opinion on what method he would use to evaluate the damages caused by such behavior. Defendant contends that leaving such complex calculations to the jury will only confuse jury members, and amounts to "unsupported speculation," and a failure to apply methods "reliably to the facts of the case." *See Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 670 (6th Cir.2010). Defendant argues that a damages expert who does not disclose damages calculations in advance of trial, and thus does not submit calculations to cross-examination during discovery, should be stricken in violation of Federal Rules of Civil Procedure 16(b), 26(a)(2), and 37(b)-(c).

Plaintiff contends that *Tamraz* is inapposite, because, even without a completed calculation, Kavanaugh's theories and exemplar calculations will assist the jury by simplifying a complex economic analysis into a "user-friendly" calculation at the damages portion of the proceedings. Fur-

ther, Plaintiff argues that Dr. Kavanaugh simply can provide the completed calculations at trial, as damages related to averting behavior are predicted to continue to accrue up to trial.

This Court concludes that Rules 16, 26, and 37 preclude Dr. Kavanaugh from using undisclosed data relating to averting behavior and performing averting behavior calculations at trial which were not disclosed previously. Dr. Kavanaugh did perform, however, some completed calculations for total averting behavior, including Mr. Griffin's personnel costs, costs paid to consultants Bennett & Williams from 2002–2012, $99,668 in Miscellaneous expenses, and such calculations and their underlying methodology were subject to examination during Dr. Kavanaugh's deposition. Defendant raises no arguments related to the reliability or relevance of such calculations.

In addition, under Fed.R.Civ.P. 26(5)(e)(2), an expert whose report must be disclosed under Rule 26(a)(2)(B) must supplement both the information included in the report and information given during the expert's testimony by the time the party's pretrial disclosures under Rule 26(a)(3) are due. In his report and deposition, Mr. Griffin explains that he failed to perform final calculations because damages related to averting behavior continue to accrue. In addition, however, Dr. Kavanaugh testified in his deposition that he was not asked to perform final calculations. Even so, Plaintiff has continued to supplement discovery with any information relevant to calculating damages.

This Court concludes that the Defendant is on notice of the methodology to be used in calculating averting behavior damages, as well as any underlying data which may

---

**2.** Kavanaugh states that "averting behavior is a rational act of self-protection that uses market resources to plan for and reduce risks to health and safety. It occurs when economic entities purchase goods or services to reduce health and safety risks."

be used to calculate such damages. Accordingly, although Dr. Kavanaugh has yet to be asked to calculate such damages, Defendants are on fair notice that he may be asked to provide such completed calculations prior to trial and all of the information that may underlie such opinions. Thus, in accordance with Rule 26(5)(e)(2), Plaintiff is to continue to supplement Dr. Kavanaugh's report with any completed calculations of damages related to averting behavior that it intends to introduce at trial. This Court concludes that Dr. Kavanaugh's opinion testimony on averting behavior is admissible.

### 3. Evergreen Letter of Credit Opinion

■ Dr. Kavanaugh opines that it is "fair to say" that if the future obligations the Plaintiff intends to ask the Court to order are not assured with strong financial instruments, then some of the costs of the C8 contamination will not be paid by the defendant. Further, Dr. Kavanaugh concludes—after reviewing a variety of approaches and instruments one might use to secure future financial obligations—the best instrument to use to assure future decontamination obligations is an "evergreen letter of credit," which are in use to assure the remediation at other Resource Conservation and Recovery Act ("RCRA") sites.

Defendant argues that Dr. Kavanaugh's opinion regarding the need for this Court to order future assurances is purely speculative, made without basis or methodology, and is a determination better left to the Court and not to an expert. *Tamraz,* 620 F.3d at 671. Specifically, Defendant asserts that nothing indicates DuPont will stop working with Little Hocking and regulatory agencies to remedy the C8 contamination on the Wellfield. Further, Defendant states that allowing such a question to be presented to the jury would be unfairly prejudicial to Defendant.

Plaintiff responds that Dr. Kavanaugh's opinion rests on first-hand knowledge of court orders being useful in RCRA cleanup suits, economic data showing it is highly unlikely that companies will survive long enough to satisfy multi-decade court-ordered obligations, projected long-term maintenance of the GAC and cleanup efforts, and knowledge of Defendant's failure to follow through on current legal obligations, such as reimbursements for consultant costs related to GAC maintenance. Defendant retorts that such a statement shows that Dr. Kavanaugh's opinion on financial assurances is not based on any methodology, and is a usurpation of the Judge's role to enforce judgments.

It is well established that experience-based testimony satisfies *Daubert's* reliability requirements. *United States v. Poulsen,* 543 F.Supp.2d 809, 811–12 (S.D.Ohio 2008) (Marbley, J) (finding expert witness' "proposed expert testimony grows out of the knowledge and experience he acquired as an FBI agent, not out of any procedures he has employed—or should be expected to have employed—in forming his opinions.") (citing *First Tennessee Bank National Association v. Barreto,* 268 F.3d 319, 333 (6th Cir.2001) (finding *Daubert* factors related to a reliable methodology inapplicable where expert's testimony was derived from his practical experience in the banking industry)). Plaintiff makes clear that it intends to request injunctive relief in the form of future assurances. Dr. Kavanaugh intends to provide experience-based testimony regarding the rationale behind ordering future financial assurances in RCRA cleanup suits, as well as an experience-based opinion on the best instrument to use should this Court award injunctive relief. Such an opinion would not invade the province of this Court, but would assist the Court in determining a fact in issue. Fur-

ther, it would not prejudice the Defendant as this Court, not the jury, will rule on matters of injunctive relief. Accordingly, this Court finds that Dr. Kavanaugh's opinions regarding future assurances are admissible under Rule 702.

### 4. Other Excludable Opinions

Defendant states that at the close of discovery, Dr. Kavanaugh failed to provide opinions about damages Little Hocking claimed to have sustained at the outset of the case, and that during his deposition he conceded he would not provide opinions about such damages.[3] Defendant argues, therefore, that since Little Hocking has failed to substantiate these damages claims, this Court should find that Dr. Kavanaugh is precluded from offering any opinions at trial concerning these damages under Fed.R.Civ.P. 26(a)(2)(B).

Plaintiff responds that Dr. Kavanaugh has offered opinions on many of the types of damages Defendant claims he failed to provide, including: economic gain in Opinion 1, future damages in Opinion 2, and cost of future corrective action and the full cost of the GAC Facility, including ongoing monitoring on the performance of the GAC in Opinion 3. Further, Plaintiff puts forth that Dr. Kavanaugh's opinion in footnote 26 of the report that Little Hocking has lost revenue and net income due to the presence of C8 in its Wellfield encompasses the following types of damages: damages for loss of use and enjoyment of property; the value of alleged loss of Little Hocking's aquifer; and, Little Hocking's alleged loss of corporate opportunity. Lastly, Plaintiff states that it has continued to supplement Dr. Kavanaugh's opinions with ample discovery, including consultant invoices, spreadsheets of personnel costs, and other interrogatory responses.

This Court has already found that Dr. Kavanaugh's testimony related to economic gain damages are not relevant and are inadmissible after finding in favor of Defendant on Count VII, Unjust Enrichment, in the Summary Judgment Opinion and Order. Dr. Kavanaugh's report and deposition make clear that while he does not provide a quantitative estimate of past, present and future lost revenue and net income (some which naturally arise from loss of use of the Wellfield, including lost taps), damage to reputation, personnel costs related to construction and maintenance of the GAC, and lost opportunity cost, he does opine that such damages exist and that they are "conceptually valid" and "existing useful" categories to consider when calculating damages. Accordingly, such opinions regarding categorization of damages may assist the trier of fact in determining appropriate damages in this case and are admissible. The quantification of such categories of damages will presumably be admitted through some other source, such as the interrogatories and spreadsheets to which Plaintiff refers.

---

**3.** These damages include: future damages, property damage, punitive damages, cost of future corrective action, damages for loss of use and enjoyment of property, rental value of Little Hocking's aquifer, the value of alleged loss of Little Hocking's aquifer, Little Hocking's alleged business losses, including alleged impaired ability to borrow and loss of agglomeration economy, Little Hocking's alleged loss of corporate opportunity, the value of alleged improper taking of property, the cost to store PFOA on Little Hocking's property, the alleged financial benefit to DuPont for failing to timely install effective air and water pollution controls once it knew its emissions or releases presented a threat to Little Hocking's water supply, the alleged profit to DuPont arising from use of C8 at the Washington Works Facility from 1984 to 2002, the value of DuPont allegedly using Little Hocking's aquifer as a disposal site, the cost to locate and provide an alternative water supply to Little Hocking, the full cost of the GAC Facility, including ongoing monitoring of the performance.

In sum, Defendant's Motion to Exclude Dr. Kavanaugh is **GRANTED** in part and **DENIED** in part.

### B. Motion to Exclude Dr. Franklin Schwartz

■ Dr. Schwartz is a hydrologist who opines that the contamination of the groundwater at the Little Hocking Wellfield is due primarily to C8 transported through the aquifer. While Defendant primarily refers to and critiques Dr. Schwartz's opinions as they relate to the existence of a "groundwater or sub-River pathway", Dr. Schwartz opines in his report that the "River Pathway," not the sub-River pathway, is the primary origin of the contamination at the Wellfield. In the River Pathway, C8, released from various sources at the Facility directly into the Ohio River, enters the River as a dissolved phase, and then is captured by wells at Little Hocking as induced infiltration of river water through sediments at the river bottom. The sub-River groundwater pathway, in contrast, refers to the aquifer underneath the Ohio River, which extends from the DuPont side of the River to the Little Hocking side of the River. This sub-River pathway is the pathway that has been the subject of numerous groundwater models, which have shown that the minimum "capture zone" does not cross the midpoint of the sub-river aquifer. Dr. Schwartz's opinion recognizes that the River Pathway and sub-river groundwater pathway intersect where river water enters the Little Hocking side of the aquifer.

Defendant argues that Dr. Schwartz's opinion about the existence of the purported groundwater pathway is nothing more than educated guesswork which should be excluded under Rule 702 as an opinion connected to the existing data by the pure *ipse dixit* of the expert. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("nothing ... re-quires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Defendant avers that Dr. Schwartz reached his purported groundwater pathway opinion without performing any testing or sampling, without running a groundwater flow model called MODFLOW, and without performing the calculations from his own textbook, which purportedly should be used to delineate the size and shape of a capture zone. According to the Defendant, these failures to identify the exact location of the capture zone render Dr. Schwartz's opinion irrelevant. Further, Defendant argues that Dr. Schwartz's failure to perform the standard calculations and run a MODFLOW model inappropriately shifts Plaintiff's burden to prove the existence of the capture zone to Defendant to disprove it. *Baker v. Chevron USA, Inc.*, No. 1:05–CV–227, 2011 WL 3652249, at *5 (S.D.Ohio Aug. 19, 2011) *aff'd sub nom. Baker v. Chevron U.S.A. Inc.*, 533 Fed.Appx. 509 (6th Cir.2013) (finding speculative Plaintiffs' expert's opinion that a plume existed in the aquifer beneath Plaintiffs' properties simply based on knowledge of the general characteristics of the plume, and holding that such guesswork inappropriately shifted the burden to Defendant to show the absence of the plume's presence beneath the properties).

This Court holds that Dr. Schwartz need not identify the particular contours of the capture zone, perform a groundwater flow model, or follow the methodology in his text book in order for his opinion about the primary River Pathway to be admissible under Rule 702. As Plaintiff explains, Dr. Schwartz's opinion that the River Pathway is the primary source of contamination in the Wellfield rest on a reasonable factual

basis—including the presence and biopersistence of C8 in the River and Wellfield—and a reliable, peer-reviewed "geochemical/tracer methodology." Under that methodology Dr. Schwartz concluded that the Ohio River, not aerial dispersion, is the primary origin of the contamination of C8 in the Wellfield by: (1) mapping of the spatial distribution of C8 in the Wellfield, which showed downriver portions of the Wellfield were more contaminated with C8 than the eastern portion, as well as on conductance measurements to understand the groundwater chemistry of the Wellfield; (2) interpreting forty years' worth of major ion and other geochemical data available for Well Two, the mid-point well, and comparing it with data from Ohio River water samples; and (3) interpreting samples of "first water" taken from an investigation of C8's distribution in sediments and groundwater undertaken by DuPont in 2002, as well as "first-water" samples taken from additional wells installed in the Wellfield in 2006.

While Defendant suggests Dr. Schwartz should have used other, more conclusive measures to prove the existence of the capture zone, an expert need not base his opinion on the "best possible evidence," or the "most ideal scientific evidence" in order for it to gain admissibility. *U.S. ex rel. Martin v. Life Care Centers of Am., Inc.*, No. 1:08–CV–251, 2014 WL 4816006, at *2–3 (E.D.Tenn. Sept. 29, 2014). Instead, the role of the Court is to ensure that expert testimony is based upon "good grounds, based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786); *see also In re Countrywide Fin. Corp. Mortgage–Backed Sec. Litig.*, 984 F.Supp.2d 1021, 1036 (C.D.Cal.2013) ("The *Daubert* standard does not exist to ensure that only the most ideal scientific evidence is admissible in court proceedings, but instead to ensure that expert testimony is derived by the scientific meth-

od.") (internal quotation omitted). As a general matter, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530.

Far from basing his opinion on mere speculation, Dr. Schwartz's testimony indicates that he infers from multiple lines of data and evidence in the record that such a capture zone exists. As such, challenges to the accuracy or import of such evidence go to the accuracy of the expert's conclusions, not to their reliability, and bear on "the weight of the evidence rather than on its admissibility." *In re Scrap Metal*, 527 F.3d at 529–31 (citing *Jahn v. Equine Services*, 233 F.3d 382 (6th Cir.2000) (finding that opinions of the proffered testimony may very well be 'shaky, but because the opinions were based upon facts in the record, and were not assumptions or guesses, challenges merely went to the accuracy of the conclusions, not to the reliability of the testimony)); *see also Bonne v. Premier Athletics*, No. 3:04–CV–440, 2007 WL 3181289, at *7–8 (E.D.Tenn. Oct. 29, 2007) (*citing United States v. Brady* 595 F.2d 359, 363 (6th Cir.1979) ("Questions about the certainty of the scientific results are matters of weight for the jury.")).

Further, Dr. Schwartz's failure to run a MODFLOW analysis, and thus to test his theory of causation, goes to weight, not to admissibility of his testimony, because his theory rests on other rational explanations and facts on the record. *See Clay v. Ford Motor Company*, 215 F.3d 663, 668 (6th Cir.2000) (failure to test goes to weight not admissibility); *accord Williams v. Gen. Motors Corp.*, 2007 WL 3232292, at *2 (N.D.Ohio Oct. 30, 2007) (holding that an expert witness presented reliable testimony, even though he did not perform any testing and his theory was not generally accepted, because conclusions were "sup-

ported by rational explanations and his methods d[id] not strike the court as novel or extreme"). Thus, while performing a MODFLOW analysis may in fact be the most conclusive method to prove the existence of a capture zone, Dr. Schwartz's methodology meets the Rule 702 standard.

Next, Defendant contends that Dr. Schwartz cherry-picked data throughout his report, and depended on unreliable data. First, Defendant argues that Dr. Schwartz failed to account for existing peer models that disprove any claim that C8 can reach the well via the groundwater. Ignoring these existing models, Defendant argues, is equivalent to "cherry-picking" facts, and renders the opinion unreliable. *LeClercq v. The Lockformer Co.,* No. 00 C 7164, 2005 WL 1162979, at *4 (N.D.Ill. Apr. 28, 2005) (finding expert's failure to account for 17 annual effluent samples reflecting non-detect for contaminants—an uncontested and material fact—amounted to cherry-picking the facts and failed to satisfy *Daubert*). Second, Defendant claims that by relying on data only from Well Two in Figures 2 and 3 of his report, and relying on data only from one date in Figures 4 and 6 of his report, Dr. Schwartz both cherry-picked data and also relied on only one sample, rending his opinion unreliable. *Id.;* see also *Renaud v. Martin Marietta Corp.,* 749 F.Supp. 1545, 1552–53 (D.Colo.1990) *aff'd sub nom. Renaud v. Martin Marietta Corp.,* 972 F.2d 304 (10th Cir.1992) (finding it was mere conjecture to conclude that one sample taken at a single location at one point in time was sufficient to prove continued exposure for over eleven years, especially when no other circumstantial evidence of contamination exposure existed). Third, Defendant argues that Dr. Schwartz used improper tracers—sulfate and chloride— which are major ions found in all surface and ground waters—and PFOA—and, thus, are too common in the environment

to be proper tracers. Finally, Defendant argues that the historic "first-water" data on which Schwartz relies contradicts Schwartz's hypothesis that air is not the primary pathway of PFOA; Defendant, however, offers little comprehensible analysis as to why Dr. Schwartz's interpretation of the data is so "clearly" incorrect.

This Court finds that none of Defendant's charges of cherry-picking data, or relying on weak data sets, ultimately undermine the reliability of Dr. Schwartz's methodology. His opinion rests on a complex web of interrelated and corroborating evidence in the record, and the data on which he relies does not rest on only one data point at one point in time, as was true in *Renaud.* Further, this Court finds that differences in interpretation of a shared data set, such as the "first-water" data set—when such differences in interpretation rest on rationale grounds—is an issue more appropriately addressed on cross-examination. *In re Scrap Metal,* 527 F.3d at 529–31. Similarly, the critique that Dr. Schwartz used unreliable tracers in part of his otherwise reliable geochemical/tracer calculations goes to the weight of his testimony, not its admissibility. Finally, as Plaintiff explained, while prior studies may have found that a sub-River pathway does not exist, Dr. Schwartz's opinion that the primary pathway is the River Pathway is not foreclosed by the results of those prior studies.

Accordingly, Defendant's Motion is hereby **DENIED.**

## C. Motion to Exclude Dr. Shira Kramer

█ Defendant argues that the following opinions of Plaintiff's expert, the epidemiologist Dr. Shira Kramer, are inadmissible under Rule 702:

**Opinion 1:** The handling and release of PFOA from DuPont's Washington

Works Site, from 1951 to present, poses an imminent and substantial endangerment to human health in the vicinity of the Site, including the Little Hocking Wellfields.

**Opinion 2:** There is an association (i.e. a positive relationship) between exposure to PFOA and a range of adverse effects on human health.

**Opinion 3:** the levels of PFOA in Little Hocking and the surrounding community pose an imminent and substantial risk of endangerment to the health of the Little Hocking community.

In the Summary Judgment Opinion and Order, this Court determined that no threat to human health as a result of C8 contamination of Plaintiff's Wellfield existed at the current time. (Doc. 439). Specifically, this Court held that the GAC currently removes C8 from Little Hocking's water to non-detect levels, and that Plaintiff failed to adduce facts showing an imminent threat that Defendant would cease operating the GAC to bring C8 to non-detect levels. Further, this Court held that Plaintiff had not demonstrated that the C8 contamination on its Wellfield presented a threat to human health via any pathway of exposure other than through the Wellfield's drinking water. Finally, this Court held that since Plaintiff has standing only to demand a remedy for injury to itself, Plaintiff's RCRA action would be interpreted only to include consideration of whether C8 contamination of the Wellfield, not the entire environment, may present an imminent and substantial endangerment ("ISE") to human health.

Accordingly, the Court held held it is irrelevant to the case *sub judice* whether levels of C8 in the surrounding community pose an imminent and substantial risk of endangerment to the human health. Considering these holdings, this Court finds that all three of Dr. Kramer's primary opinions regarding potential endangerment to human health are not relevant to this case at this time. Thus, they are inadmissible under Rule 702, and Defendant's motion is **GRANTED.**

This Court acknowledges that while Dr. Kramer's testimony is not relevant to any matter currently at issue in this case, it is possible that events may come to pass which will render her opinion important. Should this Court find, prior to trial, that Dr. Kramer's opinion is relevant to any matter at issue, this Court will rule on the admissibility of her opinions at that time. *See Hamilton Cnty. Emergency Commc'ns Dist. v. Orbacom Commc'ns Integrator Corp.*, No. 1:04–CV–7, 2005 WL 2076449, at *6 (E.D.Tenn. Aug. 25, 2005).

### D. Motion to Exclude Dr. Kurunthachalam Kannan

Dr. Kannan conducted sampling and testing of flora and fauna—including leaves, grass, and earthworms—on the Little Hocking Wellfield. He also provides a survey of academic findings on PFOA as they relate to endangerment to health and the environment. Based on his analysis of samples he collected on the Wellfield, analysis of data collected by other sources concerning PFOA on the Wellfield and in the environment surrounding the Wellfield, his review of peer-reviewed publications concerning PFOA generally and PFOA in the vicinity of the Wellfield, and his first-hand knowledge of the facts of the case, he opines the following:

**Opinion 1:** Releases of PFOA from the Facility, from 1951 to present, have resulted in considerable degree of contamination of the environment, including the Ohio River, sediments, and the LHWA Wellfield in the vicinity of the Facility. PFOA has migrated from the site by air and water releases and disposal of PFOA containing wastes into solids.

The resulting contamination presents an imminent and substantial endangerment to human health and the environment.

**Opinion 2:** Plants and animals in the vicinity of the Facility, including the Ohio River downstream of the Site, are exposed to elevated levels of PFOA and the elevated PFOA exposures pose an imminent and substantial threat to ecosystem health in the vicinity of the Site.

Defendant avers that Dr. Kannan's data measuring the average exposure of leaves, grass, and earthworm's on the Wellfield to C8 is unreliable because Dr. Kannan did not use a proper methodology for collecting data, or for testing and analyzing the data he collected. Defendant also argues that Dr. Kannan is unqualified to render opinions about how C8 may have migrated from the Washington Works Facility to the Wellfield, and whether an imminent and substantial endangerment to human health exists according the legal RCRA standard.

## 1. Admissibility of Conclusions Drawn from Data Dr. Kannan Collected, Tested and Analyzed

 Defendant argues that Dr. Kannan's collection, testing, and analysis of his samples fail at every step of his scientific process and should be excluded. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994) (*"Daubert's* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis— means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*")

First, Defendant critiques Dr. Kannan's methodology for collecting his samples. Defendant argues that Dr. Kannan failed to follow USEPA's protocol for environmental data collection, including by failing to write out a project plan that included a written hypothesis, and failing to write out a plan for proper quality assurance and quality control ("QA/QC"). Defendant also argues that Dr. Kannan did not use any sampling methodology, and so the data he collected is not representative of the Wellfield as a whole, rendering it unreliable to determine environmental endangerment. Relying on USEPA standards, Defendant argues that Dr. Kannan failed to measure and draw a precise mapping of the Wellfield, and instead drew a crude map dividing the Wellfield into eight quadrants, and failed to devise a sampling design of the Wellfield that included an explanation and justification for sample selection. Defendant cites to a 1995 treatise, which states that "only adequate subdividing of the area into homogenous subareas leads to representative and meaningful results." *See* Wagner, *Basic Approaches and Methods for Quality Assurance and Quality Control in Sample Collection and Storage for Environmental Monitoring,* 176 SCIENCE OF TOTAL ENV'T 63, 68 (1995).

Second, Defendant critiques the laboratory Dr. Kannan used, and the methodologies he used to select and test his samples. Specifically, Defendant argues that Dr. Kannan: (1) used a substandard, uncertified laboratory and unqualified graduate students to perform testing; (2) used substandard QC/QA procedures to ensure that no contamination of the samples occurred and to test and analyze the samples collected;[4] (3) failed to use a sufficient methodology in selecting which samples he

---

**4.** Specifically, Defendant argues that the testing procedure was inaccurate because Plaintiff failed to do duplicate testing, used an experimental method for analyzing plants and

leaves called ion-pair extraction, had no written procedure for testing the leaves, and did not use a "control site" to ensure the validity of testing.

would actually test, failed to support his decision to test only 19 of the 120 samples taken (10 or so from each quadrant, including leave samples from only quadrants where they existed), and failed to support his decision to test only five of the twenty-five earthworms collected; and, (4) failed to use reliable earthworm specimen because he failed to hermetically seal the samples, and then froze them and did not test them for four years.

This Court finds that the distinction between the reliability of a general methodology and the reliability of its application is a fine one. As *Paoli*, the case on which Defendant primarily relies, explains,

> it is extremely elusive to attempt to ascertain which of an expert's steps constitute parts of a "basic" methodology and which constitute changes from that methodology. If a laboratory consistently fails to use certain quality controls so that its results are rendered unreliable, attempting to ascertain whether the lack of quality controls constitutes a failure of methodology or a failure of application of methodology may be an exercise in metaphysics. Moreover, any misapplication of a methodology that is significant enough to render it unreliable is likely to also be significant enough to skew the methodology.

*In re Paoli*, 35 F.3d at 745. The *Paoli* Court clarifies, however, that when analyzing the reliability of an expert's methodology, a distinction also exists between some inaccuracy in the expert's finding and total unreliability:

> [a] judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. He or she will often still believe that hearing the expert's testimony and assessing its flaws

was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence ... The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.

*Id.* at 744–46.

Similarly, this Circuit has discussed the distinction between the reliability of an expert's methodology and the accuracy of its application in *United States v. Bonds*, 12 F.3d 540, 563 (6th Cir.1993). In *Bonds*, the Court's distinction is arguably more liberal than in *Paoli*, however, because the *Bonds* Court concluded that *Daubert's* emphasis on the reliability of the expert's principles and methodology, rather than on the conclusions ultimately drawn, indicate that misapplications of an otherwise reliable methodology is an issue of credibility better left to the jury. *Id.* at 563 ("general acceptance is required as to the principles and methodology employed," while "[t]he assessment of the validity and reliability of the conclusions drawn by the expert is a jury question; the judge may only examine whether the principles and methodology are scientifically valid and generally accepted.").

In *Bonds*, the Defendant did not challenge the general principle that individuals can be identified by their DNA, or the general methodology the Plaintiff used for identifying a person's DNA. *Id.* at 557–558. Instead, the Defendant challenged the "particular application" of the methodology used in performing those tests—including the database used, the materials used in performing the test, and the multiplication rule used—and argued that had the application of the test been different, the results reached would have been more accurate. *Id.* The Court disagreed, finding it particularly persuasive that the Defen-

dant's critiques did not ultimately challenge the "fact that the specific application of the methodology used ... generated *some probability* that the DNA sample that "matched" ... they only challenge[d] the precision of.that probability estimate." *Id.* at 558. Thus, under *Daubert,* criticism directed toward the "specific application" of an otherwise scientifically valid methodology or procedure, or "questions about the accuracy of test results" go to the weight of the evidence, not its admissibility. *Id.* at 563. Accordingly, "in general, criticisms touching on whether the lab made mistakes in arriving at its results are for the jury." *Id.* at 563.

Here, Plaintiff explains that Dr. Kannan employed the standard sampling methodology of "stratified sampling," which is commonly used to ensure representative results and is approved by the USEPA. In stratified sampling, the area to be studied

is separated into non-overlapping homogenous areas or strata, and samples are extracted from those strata. Defendant does not challenge the reliability of "stratified sampling," the general principle that randomized samples of biota in a homogenous, circumscribed environment can be used to determine the average concentration of a chemical in the biota of that environment, or that a laboratory can test those biota to determine the concentration of the contaminant in the samples.[5]

Further, while Defendant labels the "ion pair extraction" method as experimental, it does not contest that such methodology—which Dr. Kannan's lab actually developed—has been peer-reviewed, is generally accepted in the field, and that government agencies rely upon Dr. Kannan's to test PFOA samples using "ion pair extraction".[6] Dr. Kannan also cites to standard

**5.** Defendant argues that Dr. Kannan never uses the term "stratified sampling" in his report or deposition testimony, making it suspect at this stage in the proceedings that Dr. Kannan actually did follow such a methodology. Further, Defendant argues that no evidence exists on the record that Dr. Kannan in fact followed in the case at hand the same protocol he used in his prior peer-reviewed PFOA studies. This Court finds that Dr. Kannan's description of the term "stratified sampling" sufficiently matches the methodology he states he used in his report. Specifically, according to Dr. Kannan, an important factor in such sampling methodology is preexisting knowledge of the site and professional judgment, and Dr. Kannan had previously visited the site and had reviewed photographs in preparation for his two days of sample collection. From this, he concluded that the site was relatively homogenous in terms of flora and fauna, and that his simple division of the Wellfield into eight quadrants was scientifically sufficient. Plaintiff also contends that Dr. Kannan used the same stratified sampling methodology during a similar study in the Linden Chemical and Plastics site, which is a Superfund site in Brunswick, Georgia, and that a study with the data from that investiga-

tion was published in peer-reviewed research journals. Thus, the Court finds his failure to label in his report the methodology he employed does not render such methodology unreliable.

**6.** In response to Defendant's charge that the laboratory is unfit, Plaintiff states that Dr. Kannan and his laboratory have performed work for hundreds of PFOA studies over the past ten years, including for such institutions as the Centers for Disease Control and Prevention, National Institutes of Health, and the USEPA. Because of this, researchers from around the world have been trained in his laboratory to perform PFOA analysis. In addition, Plaintiff explains that lack of certification by the entity to which Defendant cites does not imply substandard quality, as this would render any university research invalid because no university environmental research labs are certified by that entity. To ensure data quality standards, Dr. Kannan's lab participates in laboratory proficiency testing and inter-laboratory comparison studies—in which the lab has participated for seven years and has always passed for perflourochemical analysis.

QA/QC procedures that his lab employs.[7]

Thus, Defendant has not persuaded this Court that Dr. Kannan did in fact employ a faulty methodology at any primary stage of his scientific investigation. Even if the alleged flaws in Dr. Kannan's methodology exist, such as sub-par randomization or quality assurance and controls, this Court is not persuaded they are "large" enough under the circumstances to render Dr. Kannan's opinions so unreliable that they will not assist the trier of fact. *See Paoli*, 35 F.3d at 745–46. Further, this Court finds that the alleged flaws in the application of Dr. Kannan's methodology do not undermine the fact that the results of Dr. Kannan's sampling, testing and analysis show there is at least some—and likely more than some—probability that the PFOA on the Wellfield has transferred into living fauna and flora at high enough concentrations to present a risk to the environment. *See Bonds*, 12 F.3d at 558.

While Defendant's attacks may be used to discredit the accuracy of the figures Dr. Kannan ultimately reached through the ion-pair extraction method, or his implementation of stratified sampling, such attacks are for the jury to weigh. *Bonne v. Premier Athletics*, No. 3:04–CV–440, 2007 WL 3181289, at *7–8 (E.D.Tenn. Oct. 29, 2007) (finding attack on the accuracy of expert's calculations, which were an application of an otherwise recognized methodology, raised a question of weight for the jury, not a question of admissibility). For instance, Defendant critiques Dr. Kannan's failure to explain with adequate precision his division of the Wellfield, or his decisions to collect 120 samples and then test 19, and to collect 25 earthworms and then test 5 (each representing 10 earthworms)

through composite testing. Such general criticisms, however, are not accompanied by a persuasive explanation of why these efforts at randomization, based on generally accepted scientific methodologies, deem Dr. Kannan's ultimate findings inadmissible and unhelpful. As Dr. Kannan explains, a qualified and highly experienced scientist exercises a degree of discretion when performing randomized sampling of a homogenous area, and his decisions do not strike this Court as breaking from a straightforward, scientific concept such as randomized sampling. *U.S. ex rel. Martin v. Life Care Centers of Am., Inc.*, No. 1:08–CV–251, 2014 WL 4816006, at *15 (E.D.Tenn. Sept. 29, 2014) (holding that statistical sampling with an "appropriate level of representativeness" has been tested and reviewed by the federal court system).

In addition, Plaintiff laid an adequate foundation to explain that Dr. Kannan's ion-pair extraction methodology and QC/QA procedures are reliable, and that his laboratory is generally accepted in the scientific community; Defendant did not raise adequate, concrete evidence to put those procedures into question. Defendant's overall argument rests on the assertion that less than perfect procedures, by any public measure, deem an expert's data inadmissible. *Daubert*, however, "requires only scientific validity for admissibility, not scientific precision." *Bonds*, 12 F.3d at 558. Questioning the credibility of Dr. Kannan's publicly recognized laboratory and its procedures, simply because he utilizes the services of Ph.D. students and performs his tests in a university lab, is grabbing at straws and wastes this Court's judicial resources.

7. Plaintiff states that Dr. Kannan used standard QA/QC procedures, including spiking of labeled internal standards, filed blanks, method blanks, and matrix spikes, were all performed to ensure reliability of data. Defendant concedes that Dr. Kannan used a "limit of quantification" calculation and field blank to ensure there was no contamination

Further, this Circuit has found that critiques of an expert's evidence gathering techniques, and the accuracy of the expert's tests based on that evidence, generally go to the weight of the evidence, not its admissibility. *See United States v. Stafford,* 721 F.3d 380, 395 (6th Cir.) *cert. denied,* —— U.S. ——, 134 S.Ct. 463, 187 L.Ed.2d 310 (2013) (finding that critiques of gunshot residue collection, such as failure to bag hands, and other possibilities of contamination of the residue, while potentially valid critiques of the accuracy of the tests and the conclusions to be drawn from them, did not relate to the tests' reliability or the reliability of the expert's testimony). Accordingly, Defendant's argument that Dr. Kannan contaminated samples in the long chain of events from collection to testing, simply because certain procedures were not followed, without actual evidence of contamination, goes to the weight of the evidence, not the reliability of the testing or Dr. Kannan's testimony. This is especially true in this case where the Defendant has not shown with any scientific particularity how such alleged failures in proper storage of the samples actually impacted the reliability of the concentration levels of PFOA found in the samples.

Finally, Defendant argues that Dr. Kannan's conclusions cannot be trusted because they have not been subject to peer-review. Defendant puts forth that Dr. Kannan admitted his methodology falls short of those required for a peer-reviewed publication because when asked why he did not analyze soil samples, he responded, "[t]hat would have been a separate study. If we were going to publish a paper, that's something we will be doing." This Court finds that Defendant's argument that Dr. Kannan's conclusions are unreliable because they have not been subject to peer review misinterprets the reliability standard in *Daubert. Daubert* held that whether a theory or methodology had been

subject to peer review was a pertinent consideration when determining reliability. 509 U.S. at 593, 113 S.Ct. 2786. In a case such as this, however, where the methodologies utilized have been subject to peer review, *Daubert* does not require that all conclusions drawn from a sufficient application of generally accepted methodologies must be subject to peer review in order for the conclusions to be deemed reliable and helpful to a trier of fact.

In sum, this Court will not exclude Dr. Kannan's testimony on the basis that his methodologies were unreliable under *Daubert.*

## 2. Qualification to Render Opinions on Fate and Transport and Whether an ISE Exists

In addition to questioning the reliability of the methodology Dr. Kannan used to determine the concentration of PFOA in the biota on the Wellfield, the Defendant challenges his qualifications and basis to render certain opinions. First, Defendant attacks Dr. Kannan's qualifications to render opinions on the fate and transport of C8—how it traveled from the Washington Works Facility to the Wellfield. Second, Defendant attacks Dr. Kannan's basis and qualifications to render an opinion on whether C8 on the Wellfield may pose an imminent and substantial endangerment to health and the environment.

■■■ This Court finds it unnecessary to assess Dr. Kannan's general qualifications to render opinions about fate and transport of contaminants in the environment. Instead, this Court holds that Plaintiff has not established a reliable foundation in the record for Dr. Kannan's expert opinion that a water pathway exists to the Wellfield. As a participant in the peer consultation panel established to review the documents submitted by DuPont to the EPA, and as a preeminent researchers of PFOA

as a contaminant in the environment, Dr. Kannan can certainly testify about his scientific knowledge of the properties of PFOA, as well as his personal knowledge and observations regarding the magnitude of PFOA contamination in the vicinity of the Washington Works Facility. Nothing in his original or supplemental report, however, indicates that he has done anything more than use his lay abilities to observe the presence of PFOA on the Facility side of the River, and on the Wellfield side of the River. He has not utilized any scientific methodology to draw his conclusion that water is a pathway of exposure, and does nothing more than adopt Dr. Schwartz's opinions as the primary basis of his opinion. Thus, Dr. Kannan's opinion regarding water transport of PFOA is hereby **EXCLUDED,** as it is not based on any scientific methodology. Further, as it is simply based on Dr. Schwartz's opinions, it will not assist a trier of fact.

Defendant also argues that this Court should exclude Dr. Kannan's opinion that Defendant's PFOA contamination has resulted in a considerable degree of contamination in the environment, including the Ohio River, sediments and the Wellfield, and that such contamination presents an imminent and substantial endangerment to health and the environment. First, Defendant argues that Dr. Kannan's opinion about endangerment ignores the dose, or level, at which PFOA exposure harms health or the environment. Second, Defendant argues that Dr. Kannan's opinion ignores that there is no proof in the record that the PFOA on the Wellfield has actually harmed the biota on the Wellfield. Third, Defendant argues that Dr. Kannan's opinion that his test results show a risk to the environment downstream rests on no basis. Finally, Defendant argues that insofar as Dr. Kannan bases his imminent and substantial endangerment opinions on EPA guidelines for finding Resource Conservation and Recovery Act ("RCRA") actionability, Dr. Kannan should be barred from rendering an opinion based on a legal standard rather than a scientific standard.

First, as this Court explained in the above holding in the Motion to Exclude the Testimony of Dr. Shira Kramer, according to the Summary Judgment Opinion and Order, any testimony regarding a potential threat to human health due to contamination of the Wellfield or the surrounding environment is not relevant to this case at the present time. (Doc. 439). This Court held in the Summary Judgment Opinion and Order that since Plaintiff has standing only to demand a remedy for injury to itself, Plaintiff's RCRA action would be interpreted only to include consideration of whether C8 contamination of the Wellfield presents an imminent and substantial endangerment to the environment. Accordingly, it is irrelevant to the case *sub judice* whether levels of C8 in the surrounding environment pose an imminent and substantial risk of endangerment to the environment. Thus, Dr. Kannan's opinions about threat to human health, and threat to the environment that are unrelated to the Wellfield, are hereby excluded.

In terms of Dr. Kannan's opinions regarding potential imminent and substantial risk of endangerment to the environment of the Wellfield, and the greater environment due to the contamination of the Wellfield, this Court holds that the record shows Dr. Kannan is qualified to opine on how and why such contamination may present an imminent and substantial risk of endangerment to the environment from a scientific perspective, but not from a legal perspective. Dr. Kannan's report includes a bibliography of peer-reviewed articles on which he relies to draw his conclusion that the level of exposure to C8

he discovered in his biota samples may present an imminent and substantial risk to the food chain. The phrase "may present an imminent and substantial endangerment" has normative, semantic import, and is the legal standard the jury must find is met in this case. Accordingly, the fact that Kannan fails to quantify the dose of C8 that presents a risk of harm, or account for observable harm to biota in the Wellfield, does not render unhelpful his scientific opinion that the elevated level of C8 in the biota he tested, based on his knowledge and research of C8, may present an imminent and substantial endangerment to the environment. Such expert testimony is relevant to the jury's ultimate factual determination that PFOA may present a threat to the environment. What Dr. Kannan cannot do, however, is refer to the legal RCRA standard or EPA guidelines for imminent and substantial endangerment to support his scientific opinion. *Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir.1994) (finding an expert's testimony offering a legal conclusion by referring to the legal standard in the case invaded the province of the court because "[i]t is the responsibility of the court, not testifying witnesses, to define legal terms.").Thus, such opinions are admissible.

In sum, Defendant's Motion is **GRANTED** in part and **DENIED** in part. This Court hereby excludes Dr. Kannan's expert opinion testimony concerning an ISE to human health; independent, expert opinion testimony regarding a water pathway for C8 from the Facility to the Wellfield; and testimony that refers to the legal RCRA standard or EPA guidelines for an ISE to support his scientific opinion. All remaining opinions are admissible.

### E. Motion to Exclude Dr. Margi Peden–Adams

 Dr. Peden–Adams is an ecological toxicologist, and she assessed ecological receptor exposure to PFOA on the Wellfield, as well as the hazard associated with such exposure. Specifically, she relied on: Dr. Kannan's data of the amount of PFOA in groundwater, soil, grass, tree leaves, and earthworms on the Wellfield; Plaintiff's expert, Dr. Dilley's, survey of the flora and fauna present on the Wellfield; Corporate Remediation Group (CRG) data from 2008; and, soil samples of the Wellfield from 2002 and 2006. Using this data, she performed calculations to determine daily and chronic exposure to PFOA for fourteen ecological receptors at the Wellfield. These calculations showed that daily exposure was "exceedingly high." She also concluded that chronic exposure from contaminated matrices will occur from resident species, and calculated that chronic exposure over a six month and one year time frame. Daily exposure estimates were then used to determine hazard quotients, which estimate likelihood of harm to the receptors. From these interlacing observations and calculations, Dr. Peden–Adams concluded that the hazard quotient based on estimated exposure, as well as hazard quotients based on environmental matrix concentrations at the Wellfield, demonstrate that harmful effects to ecological receptors at the Wellfield are likely to occur. While she does not base her opinion on a set dose, her opinion is based on a review of available literature analyzing the effects of PFOA on a variety of animals.

Defendant argues that Dr. Peden–Adam's opinions should be excluded because they are unreliable, irrelevant and speculative. Defendant argues, first, that Dr. Peden–Adams failed to follow the scientific method of first generating a hypothesis and then testing it, because she testifies in her deposition that she first determined that an "imminent and sub-

stantial endangerment" existed and then calculated the hazard quotient. *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. In reviewing Dr. Peden–Adam's report and deposition, this Court finds that Defendant's argument mischaracterizes Dr. Peden–Adam's testimony. Dr. Peden–Adams first calculated daily and chronic exposure to PFOA of environmental receptors at the Wellfield. Then, from her review of the literature, she determined that such exposures were very high. She characterizes this finding in her deposition as a finding of "imminent and substantial endangerment." The next step in her scientific process confirmed her conclusion, because her calculation of hazard quotients based on her calculations of exposure levels supported her conclusion that harmful effects were likely to occur. Neither Dr. Peden–Adam's scientific process, nor her conclusions on the path to a more thorough investigation, strikes this Court as breaking with the scientific method.

Next Defendant avers that Dr. Peden–Adam's conclusions are unreliable because they are based on outdated, irrelevant and unreliable data and methodology. First, Defendant attacks Dr. Peden–Adam's reliance on the data produced by Dr. Kannan, which Defendant argues is unreliable. Primarily, Defendant argues that Dr. Peden–Adams relied on Dr. Kannan's findings and conclusions about concentrations of C8 in biota in the Wellfield without taking independent steps to ensure such data was reliable, which is grounds for exclusion. *Info–Hold, Inc. v. Muzak LLC,* No. 1:11–CV–283, 2013 WL 4482442, at *5 (S.D.Ohio Aug. 20, 2013) *reconsideration denied,* No. 1:11–CV–283, 2013 WL 6008619 (S.D.Ohio Nov. 13, 2013) ("to satisfy Rule 702's standards for reliability, an expert's testimony must be based on independent analysis and objective proof . . . .it is improper at law for [an expert] to form his opinions by relying on the facts and data of another expert's report without conducting his own investigation or independent verification.").

Plaintiff responds that Dr. Kannan's data is indeed reliable, and that Dr. Peden–Adams took the steps normally taken in the field by experts before relying on a data set: Dr. Peden–Adams reviewed Dr. Kannan's data and read his report and deemed both to be reliable; further, she considered that she has a long standing knowledge of Dr. Kannan's work because both scientists focus on PFOA research, and she has a high opinion of his research. Further, Plaintiff argues that under Fed. R.Evid. 703, an expert may rely on data she did not personally collect, including data provided by another expert without having to conduct her own tests. *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94–95 (2d Cir.2000) (rejecting Defendant's argument that expert's opinion was unreliable because she failed to conduct her own tests and relied only on data provided by Defendant's own experts and another source.).

This Court finds that under the circumstances of this case, Dr. Peden–Adam's reliance on Dr. Kannan's data set to perform her independent calculations does not render her opinion unreliable. First, this Court has already deemed Dr. Kannan's data and opinions admissible. Additionally, this Court finds that the facts of the cases on which Defendant relies are distinguishable from the facts in the case *sub judice.* *Info–Hold,* the case to which Defendant cites, relies on a Tenth Circuit case, *TK–7 Corp. v. Estate of Barbouti,* for the proposition that it is improper for an expert to rely on the data of another expert without conducting her own investigation. 993 F.2d 722, 732 (10th Cir.1993). In *TK–7,* the Court concluded that an expert witness improperly relied on certain sales projections generated by another ex-

pert witness because there was no indication in the record that the expert who adopted the other expert's data wholesale "had any familiarity with the methods or reasoning" used by the other expert in arriving at his projections. *Id.* Further, the *TK–7* Court found persuasive that the expert who adopted the projections "knew little or nothing at all" about the expert who had made the projections. *Id.* The evidence also showed that the expert had done "next to nothing" to corroborate those projections. *Id.* In sum, the Court found that the expert's assumption of the accuracy of the other expert's projections could not be considered "reasonable reliance" for purposes of forming his own opinion about lost profits. *Id.* Similarly, in *Info–Hold,* the Court found that the expert inappropriately relied on defendant's damages expert's numbers without examining the underlying documentation or independently verifying the defendant's expert's numbers. 2013 WL 4482442, at *5.

In contrast to the circumstances underlying the Courts' determinations in *TK–7* and *Info–Hold,* this Court finds that Dr. Peden–Adam reasonably relied on Dr. Kannan's data set for the purposes of calculating risk exposure and hazard quotients. First, Dr. Peden–Adams is a scientist whose qualifications and background lend themselves to the inference that she has knowledge of the basic methods and reasoning Dr. Kannan used to stratify randomly his samples and test them for their C8 concentration. Second, unlike in *TK–7* and *Info–Hold,* Peden–Adams testifies that she reviewed the report and testimony of Dr. Kannan, and concluded, based on her general understanding of his methodologies and reasoning, that his data was reliable. Third, unlike in *TK–7,* Dr. Peden–Adams does have professional knowledge of Dr. Kannan's work and has interacted with him professionally on various occasions. Fourth, as opposed to the type of data on which the experts in *TK–7* and *Info–Hold* relied—which included raw data that can be verified easily, or data based on calculations using available raw data— Dr. Kannan's data originated from an extensive process of field sampling and laboratory testing. As such, this Court concludes that since other indicia of scientific validity are present, and the Dr. Peden–Adams considered those indicia when assessing the validity of Dr. Kannan's data set, Dr. Kannan's data it is not the type that must be independently verified in order to be reliably used by another expert. *Gussack,* 224 F.3d at 94–95 (citing *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 524 (2d Cir.1996) ("Dr. Brown did not personally visit the landfills or dig up any shovelfuls of waste, but he was not required to do so.")).

Next, Defendant outlines a series of arguments to undermine the reliability of the facts on which Dr. Peden–Adams bases her calculations and opinions. First, Defendant argues that Dr. Peden–Adams used outdated Corporate Remediation Group (CRG) data from 2008, and outdated soil samples from 2002 and 2006, which render such data irrelevant in determining whether an imminent and substantial endangerment still exists on the Wellfield. Additionally, Defendant contends that Dr. Peden–Adams food ingestion rate calculations are unreliable; Defendant argues that Dr. Peden–Adams inappropriately ignored data from the CRG report that shows PFOA was non-detectable in vole specimen tested, simply because it was non-detectable and came from a small sample size, but she included a fish data point even though it included an outlier PFOA level. Defendant relies on an Indiana District Court case where the Court excluded an expert's risk assessment testimony because the assessment "was performed by using only a limited

number of the available samples, and those that would tend to magnify greatly the risk calculation." *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *10–11 (S.D.Ind. Sept. 18, 2006). Defendant argues that like the expert in *Allgood*, Dr. Peden–Adams "failed to offer any scientific justification for his sample selection choices." *Id.* Finally, Defendant contends that Dr. Peden–Adam's literature review is unreliable because she cites to one study for a conclusion which Defendant argues the author did not reach, and because she relies on twelve toxicology reports which analyze, in whole or in part, PFOS, a compound with a similar but not identical chemical structure to PFOA.

This Court is not persuaded by Defendant's attempts to characterize Dr. Peden–Adam's methodologies as wholly unreliable simply by pointing to every potential source of potential inaccuracy in her conclusions. Courts must take care not to "confuse the credibility and accuracy of the [expert's opinion] with its reliability." *In re Scrap Metal*, 527 F.3d at 529; *see also Stuckey v. Online Res. Corp.*, No. 2:08–CV–1188, 2012 WL 1808943, at *3–4 (S.D.Ohio May 17, 2012) (Marbley, J) (finding Defendant's argument for exclusion of expert testimony confused the weight, credibility, and accuracy of expert witness' proposed testimony with its reliability). While a court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," *see Kumho Tire Co.*, 526 U.S. at 158, 119 S.Ct. 1167, "[w]eakness in the factual basis of an expert witness' opinion simply bears on the weight of the evidence, not its admissibility." *Dow Corning Corp. v. Weather Shield Mfg., Inc.*, No. 09–10429, 2011 WL 2490962, at *9–12 (E.D.Mich. June 22, 2011) (citing *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993)). Dr. Peden–Adam's data decisions are patently distinguishable from the expert's in *All-*

*good.* There, the expert explicitly and intentionally cherry-picked samples only showing higher concentrations of the contaminants while excluding all low-concentrations, with the effect of "magnify[ing] greatly the risk." *Allgood*, 2006 WL 2669337, at *11. In contrast, Dr. Peden–Adams testifies that she withheld one sample type of many because she deemed it unrepresentative, and she included a single outlier fish data point. Defendant does not contend that such decisions, whether scientifically sound or not, so greatly magnified the risk or skewed the data that it shows no probability that any environmental receptors face risk exposure to C8 according to Dr. Peden–Adam's many calculations. *See United States v. Bonds*, 12 F.3d 540, 558 (6th Cir.1993). Similarly, Defendant fails to substantiate its claim that her misquote of one of many peer-reviewed articles on which she relies to determine the toxicity and effect of PFOA on living things, or her reliance on articles which discuss PFOS, a compound which is structurally similar but not identical to PFOA, go to the weight of her testimony rather than its admissibility. This Court considers such partial discrepancies in her literature review to be "weaknesses in the factual basis" of her opinion, but not grounds for exclusion. *See Dow Corning Corp.*, 2011 WL 2490962, at *9–12.

Next, Defendant attacks Dr. Peden–Adam's ultimate opinion that the environment on the Wellfield and the greater environment may face imminent and substantial endangerment due to the presence of C8 on the Wellfield. First, Defendant argues that Dr. Peden–Adams has no evidentiary foundation to substantiate her food-chain biomagnification theory—the idea that since C8 has been detected at the bottom of the food chain, higher trophic level predators will be exposed to PFOA. Defendant also attacks the catfish data,

which is a partial basis of the food-chain biomagnification theory, because Dr. Peden–Adams used data only from pieces of the fish, and not from the whole fish, which would have made her calculations more reliable.

■ This Court finds Defendant's attacks unpersuasive. An expert need not base her opinion on the "best possible evidence," or the "most ideal scientific evidence" in order for it to gain admissibility. *U.S. ex rel. Martin*, 2014 WL 4816006, at *2–3. Instead, the role of the Court is to ensure that expert testimony is based upon "good grounds, based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786). Accordingly, Dr. Peden–Adam's reliance on available, reliable partial fish data, while not necessarily the best data to perform the most ideal calculation, goes to weight, not admissibility. Further, her inability to testify to watching a raccoon on the Wellfield eat a catfish near the Wellfield similarly goes to weight not admissibility of her food-chain biomagnification theory. The record shows that raccoons are present on the Wellfield and that catfish in the vicinity of the Wellfield are exposed to PFOA. Further, scientific literature and EPA studies that analyze the diets of the species Dr. Peden–Adams includes in her analysis shows that raccoons catch fish in rivers. Rule 703 permits "experts [to] render opinions based solely upon hypotheticals presented by counsel." *Dow Corning Corp. v. Weather Shield Mfg., Inc.*, 2011 WL 2490962, at *9. Similarly, the inferences Dr. Peden–Adams draws concerning food chain biomagnification, which are based on "good grounds" in the record, are admissible under Rule 703.

Second, Defendant argues that since Dr. Peden–Adams cannot identify a specific dose at which PFOA poses an imminent and substantial endangerment to any particular biological receptor, her opinion concerning the likelihood of imminent and substantial endangerment to the environment is unsubstantiated and irrelevant. Plaintiff retorts that while Dr. Peden–Adams does not purport to have determined a minimum dose to PFOA that is likely to cause harm for each environmental receptor she analyzed, the hazard quotient Dr. Peden–Adams calculated is sufficient to show that an imminent and substantial endangerment may exist to environmental receptors generally exposed to PFOA on the Wellfield. The hazard quotient is the ratio of the exposure estimate of environmental receptors to PFOA to the concentration considered to represent a "safe" environmental dose. Plaintiff explains Dr. Peden–Adams relied on site-specific data from the Wellfield to determine the daily dose, and then she compared those doses to peer-reviewed literature that includes estimates of exposure currently known to produce toxic effects in some environmental receptors. Although she cannot identify a precise dose for each receptor she analyzes, she generally concludes that the conditions on the Wellfield may present a threat to the species for which she calculated a hazard quotient of greater than one.

Similar to this Court's analysis of Dr. Kannan's testimony, this Court finds that while Dr. Peden–Adams lays a reliable foundation permitting her to testify from a scientific perspective why an imminent and substantial risk of endangerment to the environment exists, she cannot testify to the same from a legal perspective. The phrase "may present an imminent and substantial endangerment" has normative, semantic import, and is the legal standard the jury must find is met factually in this case. Accordingly, Dr. Peden–Adam's opinion that her calculations of risk exposure and hazard quotients show potential

imminent and substantial endangerment to the food-chain is relevant to the jury's ultimate factual determination that PFOA may present a threat to the environment. Dr. Peden–Adam's failure to quantify the exact dose of C8 that presents a risk of harm to each environmental receptor does not undermine the reliability or relevance of her opinion, or the fact that it is helpful to the trier of fact. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir.2008) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir.2000) (internal quotation marks omitted) (The burden on a party proffering expert testimony is to "show by a preponderance of proof that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues.")). While a calculation of the exact dose may be the best evidence to support her opinion, that is not what *Daubert* requires. *U.S. ex rel. Martin*, 2014 WL 4816006, at *2–3. What Dr. Peden–Adams cannot do, however, is refer to the RCRA standard or EPA guidelines for imminent and substantial endangerment to support her opinion. *Berry*, 25 F.3d at 1353.

In sum, Defendant's Motion is **GRANTED** in part and **DENIED** in part. This Court hereby excludes Dr. Peden–Adam's expert opinion testimony that refers to the legal RCRA standard or EPA guidelines for an ISE to support her scientific opinion. All remaining opinions are admissible.

### F. Motion to Exclude Dr. Staci Simonich

██ Dr. Simonich is a chemist who has performed extensive research on the fate and transport of persistent chemicals, such as C8. Based on a calculation that relies on known relevant properties about the movement of C8 in water, as well as her knowledge of total process discharges of C8 from the Facility, Dr. Simonich opines that since 1951, 12,649–37,948 pounds of C8 has sorbed to Ohio River Sediment. She opines that due to the extreme persistence of C8 in the environment, slow transport downstream of Ohio River Sediment, and the very slow flow of the river near the Wellfield and the Facility due to the Belleville dam, there has been an increased buildup of sediment and C8 near LHWA. She further opines that assuming the existence of the River Pathway based on Dr. Schwartz's opinion, this buildup will continue to be a significant, long-term source of C8 to the Wellfield groundwater that may present an imminent and substantial endangerment to the environment at the Wellfield. She opines that a systematic evaluation of Ohio River sediments, using a statistically based sampling grid, is needed to determine the full nature and extent of C8 sediment contamination.

Defendant argues that this Court should exclude the opinions of Dr. Staci Simonich regarding the fate and transport of C8 and its chemical properties because they lack foundation, and are unreliable, speculative and irrelevant, are not based on sufficient data, and are based on a faulty methodology.

First, Defendant argues that Dr. Simonich's opinion is unreliable and irrelevant because it is based on a single calculation which ultimately does not determine how much C8 actually sorbed to the sediment in the alleged Wellfield capture zone. Thus, Defendant alleges that Dr. Simonich's opinion does not shed light onto how much C8 actually reaches the Wellfield, and cannot be the basis of an ISE opinion. To support its contention that Dr. Simonich's single and allegedly faulty calculation cannot form the basis of her inadmissible opinion, Defendant relies on the case *Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545, 1552–53 (D.Colo.1990) *aff'd*

*sub nom. Renaud v. Martin Marietta Corp.,* 972 F.2d 304 (10th Cir.1992). As discussed *supra,* in that case the Court held that Plaintiffs could not support their assertion that contamination exposure had existed for eleven years when that assertion was based on only one data point at one point in time, especially because no other circumstantial evidence existed to prove contamination exposure.

This Court finds that the facts of *Renaud* are inapposite to this case. *Renaud* determined that a single data point could not form the basis of a reliable opinion. Here, Dr. Simonich relies on an extensive, verified database of information, including the amount of process discharges from the Facility over time, as well as relevant properties of C8 that are generally known among the scientific community. Then, she applies such information to a calculation—the validity of which the Defendant does not challenge—to determine the amount of C8 sorbed in Ohio River sediment. Finally, she opines based on her knowledge of the chemical properties of C8 and the Ohio River flow near the Wellfield that a significant portion of this C8–contaminated sediment is in the vicinity of the Wellfield. Such a methodical scientific process cannot be compared to the *Renaud* expert's conclusion, which rested on a single data point. Because the RCRA standard is broad and remedial, Dr. Simonich's opinion is relevant to the trier of fact's determination of whether an imminent and substantial endangerment *may* exist. While it is true that Plaintiff must ultimately show an ISE exists, and the import of Dr. Simonich's ISE opinion ultimately relies on the weight given to Dr. Schwartz's opinion, there is no requirement that the unitary testimony of every expert witness must establish liability conclusively in a case. *One Beacon Ins. Co. v. Broad. Dev. Grp., Inc.,* 147 Fed.Appx. 535, 545 (6th Cir.2005) (holding expert's testimony that a building defect was a possible cause of building collapse, but not necessarily the probable cause of collapse (which was the legal standard) went to the significance of the testimony, because there is no requirement that every expert witness' testimony must establish liability).

Second, Defendant contends that Dr. Simonich failed to consider relevant and sufficient facts, thus rendering her opinion unreliable and irrelevant, including: failure to calculate or consider the desorption rate of C8 over time; failure to consider properly the mobility of C8 in water; failure to consider the particular characteristics of the sediment around Little Hocking; and, failure to calculate a contamination plume area. In short, Defendant contends that anything short of performing a River sediment study to prove all of her opinions definitively—which is the remedy she actually suggests—renders Dr. Simonich's opinion unreliable.

This Court finds that Dr. Simonich's failures to consider certain relevant facts go to the weight of the testimony, not its admissibility. First, Dr. Simonich's opinion is based on an estimate, and she never purports to present an exact opinion about the amount of C8 in the sediment within the Wellfield's capture zone. Instead, she opines generally that C8 likely has sorbed to sediment within the capture zone at a significant enough level to present an ISE under the assumption that a capture zone exits. Considering the remedial nature of the ISE standard, this Court finds that such an opinion is helpful to the trier of facts.

Further, considering Dr. Simonich's opinion is based on an estimate, and Defendant does not question the reliability of her calculations otherwise, the factors that she failed to consider in her opinion—such as the exact characteristics of the River

sediment and the desorption rate over time—are not of the type that render her calculation wholly unreliable, but only undermine the weight to be given such testimony. This Court's opinion in *Novovic v. Greyhound Lines, Inc.*, No. 2:09–CV–00753, 2012 WL 252124, at *13–14 (S.D.Ohio Jan. 26, 2012) (Marbley, J) is illustrative. In that case, the Defendant argued that Plaintiff's damages expert's opinion was unreliable because it failed to consider the decedent's immigration status, thus affecting calculations for lost earnings. This Court ruled that like a district court had ruled ·in *Pirolozzi v. Stanbro*, 73 Fed. R. Serv.3d (Callaghan) 766, 2009 WL 1314765 (N.D.Ohio 2009), failure to consider "multiple significant factors" in a damages calculation went to the weight, not admissibility of the testimony, especially considering the Defendant's opportunity to cross-examine the expert, and the admissibility of such relevant factors at trial. *Id.* at *14. Similarly, this Court finds that in this case, the Defendant will have the opportunity to cross-examine Dr. Simonich regarding what it deems to be relevant factors affecting the accuracy of her overall opinion that the C8 that she estimates sorbed to the Ohio River Sediment presents a continuous source of contamination to the Wellfield. As such, this Court holds that such failures to account for these factors in Dr. Simonich's opinion go to the weight, not admissibility of her opinion. The Motion is **DENIED**. Plaintiff's expert economist, Dr. Simonich, will be permitted to testify.

## V. CONCLUSION

For the forgoing reasons, Defendant's Motion to exclude Dr. Kramer is **GRANTED**, (Doc. 342); Defendant's Motions to exclude Dr. Kavanaugh, Dr. Kannan, and Dr. Peden–Adams are **GRANTED** in part and **DENIED** in part, (Docs. 340, 343, and 344); and Defendant's Motions to Exclude

Dr. Schwartz and Dr. Simonich are **DENIED**. (Docs. 341, 347).

**IT IS SO ORDERED.**