EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE
This matter is before the Court Defendant's Motion to Exclude Plaintiffs' Corporate Conduct Experts (ECF No. 2819), Plaintiffs' Memorandum in Opposition to Defendant's Motion (ECF No. 3198), and Defendant's Reply in Support of its Motion (ECF No. 3556). In accordance with this Opinion and Order, for the reasons set forth below, the Court GRANTS IN PART AND DENIES IN PART DuPont's Motion.
I.
Defendant E. I. du Pont de Nemours and Company ("DuPont") directs its Motion to expert witnesses who were retained by Plaintiff Carla Marie Bartlett and Plaintiff John Wolf, the first two Plaintiffs selected for trial ("Trial Plaintiffs") in this multidistrict litigation ("MDL"). Mrs. Bartlett's case is scheduled for trial on September 14, 2015, and Mr. Wolf is scheduled to take his case to trial on November 30, 2015.
The Trial Plaintiffs both allege that they are members of the class ("Leach Class") of individuals who are permitted under a contractual agreement ("Leach Settlement Agreement") to file claims against DuPont based on six human diseases ("Linked Diseases") that they believe were caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant. (Leach Settlement Agreement; ECF No. 820-8.) Mrs. Bartlett alleges that she suffered from kidney cancer and Mr. Wolf claims that he suffers from ulcerative colitis. Both of these human diseases are Linked Diseases. In the Trial Plaintiffs' cases, and the other approximately 3500 cases in this MDL, the claims arise from, inter alia , DuPont's alleged breach of its duty of care.
In its defense, DuPont asserts that it "neither knew, nor should have known, mat any of the substances to which [the Trial Plaintiffs were] allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific and/or industrial knowledge available to DuPont at all times relevant to the claims or causes of action asserted by [the Trial Plaintiffs]." (DuPont's Answer to Bartlett Compl. ¶ 232; ECF No. 35.) DuPont further answered that it has "complied with all applicable statutes and regulations set forth by local, state and/or federal government(s)" with *900 regard to the conduct alleged, and that "all conduct and activities of DuPont related to matters alleged in the Complaint conformed to industry standards based upon the state of medical, scientific and/or industrial knowledge which existed at the time or times that [the Trial Plaintiffs are] alleged to have been exposed." (Id. ¶¶ 237, 240.)
DuPont and the Trial Plaintiffs have retained experts to opine on whether DuPont conformed to the industry standards based upon the state of the medical, scientific and/or industrial knowledge available to DuPont during the relevant time period. The parties refer to these witnesses generally as "corporate conduct" experts. DuPont moves to exclude all six of the Trial Plaintiffs' corporate conduct expert witnesses. DuPont's current motion is directed at the following four experts: (1) Barry S. Levy, M.D., M.P.H.; (2) Michael B. Siegel, M.D., M.P.H. (3) Stephen E. Petty, P.E., C.I.H., C.S.P.; and (4) Steven Amter, B.S., M.S. DuPont contends that the these four expert witnesses should be prohibited from testifying because they lack any appropriate qualifications, their opinions are unreliable and will not assist a jury. DuPont also contends that the testimony is unfairly prejudicial, contusing, misleading, and needlessly cumulative.
II.
DuPont's motion is governed by Rules 702 and 403 of the Federal Rules of Evidence.
A. Federal Rule of Evidence 702
Rule 702 of the Federal Rules of Evidence governs the use of expert testimony, providing:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Fed. R. Evid. 702.
This rule, as amended in 2000, reflects the Supreme Court's decisions in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Kumho Tire Co. v. Carmichael , 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("In Daubert the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in Kumho clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science.").
This Court has broad discretion to determine whether to admit or exclude expert testimony. In re Scrap Metal Antitrust Litig. , 527 F.3d 517, 528 (6th Cir. 2008) ("[W]e will not substitute our own judgment for that of the district court and will reverse an evidentiary decision "only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment." (citation omitted) ). The burden is on the party proffering the expert report and testimony to demonstrate by a preponderance of proof that the opinions of their experts are admissible. Nelson v. Tenn. Gas Pipeline Co. , 243 F.3d 244, 251 (6th Cir. 2001).
Determining the admissibility of expert testimony entails a flexible inquiry and any doubts should be resolved in favor of admissibility.
*901 Daubert, 509 U.S. at 594, 113 S.Ct. 2786 ; Fed. R. Evid. 702 advisory committee's notes, ("[A] review of the case law... shows that rejection of the expert testimony is the exception rather than the rule."); Jahn v. Equine Services, PSC, 233 F.3d 382, 388 (6th Cir. 2000) (stating that in Daubert "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony" (internal quotations omitted) ). Additionally, if the evidence is deemed admissible by a court, but it is ultimately found "insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment." Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ; see also Fed. R. Civ. P. 50.
As to Rule 702, the Sixth Circuit explains:
Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Id. Third, the testimony must be reliable. Id. Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." Id.
In re Scrap Metal Antitrust Litig. , 527 F.3d 517, 528-29 (6th Cir. 2008).
B. Federal Rule of Evidence 403
Federal Rule of Evidence 403 permits exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following; unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Whether to exclude evidence under Rule 403 is a matter within the trial court's discretion. Paschal v. Flagstar Bank, 295 F.3d 565, 576 (6th Cir. 2002). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Id.
III.
In its Motion, DuPont first argues that any expert testimony "offering opinions as to corporate intent and motives, and measuring corporate conduct against internal aspirations and inapplicable ethical standards-is not a proper subject of expert testimony and should be excluded from trial." (DuPont's Mot. at 10.) DuPont moves for complete exclusion of the Trial Plaintiffs' expert witness' testimony, claiming that some of it is directed at this type of evidence.
Next, DuPont contends that the Trial Plaintiffs' expert witnesses are not qualified to provide their proffered testimony, stating that, "while arguably qualified in other areas ... each of Trial Plaintiffs* proposed experts lacks any requisite experience or qualifications to opine as to DuPont's corporate intent, decision-making, and conduct." Id. at 12.
The Trial Plaintiffs respond that the opinions of their experts are not directed at DuPont's intent and motives, and measuring corporate conduct against internal aspirations and inapplicable ethical standards, *902 but instead are directed at the following;
[E]aeh of the Experts focus on addressing the state of knowledge/state of the art on C-8 risks during the time in question and DuPont's compliance with applicable standards of care existing within each of the Experts' respective fields of expertise. Not only are such topics a proper subject of expert testimony (as confirmed by the law discussed below and the topics and opinions addressed by DuPont's own experts ), but each of Plaintiffs' Experts is more than qualified to provide such opinions.
(Trial Pls.' Mem. in Opp. at 8.)
DuPont does not challenge that its own experts opine on the state of knowledge/state of the art on C-8 risks and DuPont's compliance with the applicable standards of care, but rather argues that "unlike DuPont's designated experts, Trial Plaintiffs' 'Corporate Conduct' Experts seek to opine on issues outside of their areas of expertise and attempt to usurp the roles of both judge and jury." (DuPont's Reply at 3.) DuPont continues that the Trial Plaintiffs' experts' opinions are "unhelpful" because the experts merely "regurgitate" the facts from a simple historic record that any lay "jury is fully capable of reading" and understanding on their own. (DuPont's Mot. at 15-18.) Further, DuPont asserts, "in addition to usurping the role of the jury, testimony by these witnesses that DuPont violated ethical or industry standards (which are not the applicable legal standard) would be unfairly prejudicial and highly likely to mislead and confuse the jury." Id. at 26.
The Court will address DuPont's Motion by looking first at (A) the relevant law; (B) DuPont's arguments addressed to all of the experts; (C) DuPont's arguments addressed to each individual experts.
A. Relevant Law
It is well established that experience-based testimony satisfies Rule 702 admissibility requirements. See Kumho Tire Co., Ltd., 526 U.S. at 141, 119 S.Ct. 1167 ; United States v. Poulsen , 543 F.Supp.2d 809, 811-12 (S.D. Ohio 2008). Thus, an expert who intends to provide experience-based testimony or an experience-based opinion may well assist the trier of fact in understanding the evidence and/or in determining a fact in issue.
Courts have typically barred expert opinions or testimony concerning a corporation's state of mind, subjective motivation, or intent. See, e.g., In re Rezulin Prods. Liab. Litig. , 309 F.Supp.2d 531 (S.D. N.Y. 2004). In general, courts have found that this type of "testimony is improper ... because it describes 'lay matters which a jury is capable of understanding and deciding without the expert's help' " Id. at 546 (citation omitted); see also Sanchez v. Boston Sci. Corp. , No. 2:12-cv-05762, 2014 WL 4851989, at *3-4, 10, 18-19, 29-30, 30-31, 2014 U.S. Dist. LEXIS 137189, at *9-10, 25, 48, 79, 81-83 (S.D. W. Va. Sept. 29, 2014)[1] (considering it to "to usurp the jury's fact-finding function by allowing an expert to testify as to a party's state of mind");
*903 Mahaney v. Novartis Pharms. Corp. , 2011 WL 13209806, at *6-7, 14-15, 2011 U.S. Dist. LEXIS 156848, at *21-23, 47-49 (W.D. Ky. Sept. 9, 2011) ("testimony of this ilk will be excluded"). Although witnesses may discuss certain subjects about which they possess specialized knowledge, this does not mean they are allowed to speculate regarding corporate intent, state of mind, and/or motivations. See In re Rezulin , 309 F.Supp.2d at 546 ("[T]he opinions of these witnesses on the intent, motives or states of mind of corporations ... have no basis in any relevant body of knowledge or expertise.").
Contrarily, courts have generally permitted expert testimony regarding standards of care in situations where the testimony is "distinctively related to a profession beyond the nderstanding of the average layman." Betz v. Highlands Fuel Delivery, LLC , No. 5:10-cv-102, 2013 WL 392480, at *6, 2013 U.S. Dist. LEXIS 13290, at *17-18 (D. Vt. Jan. 31, 2013) (discussing the standard of care for refurbishment and recertification of propane tanks as "not something within the knowledge of the average layperson"); Cook v. Rockwell Intern. Corp. , 580 F.Supp.2d 1071, 1149 (D. Colo. 2006) (rejecting defendant's argument that expert's "testimony is no more than a summary of documentary evidence" and finding that "[s]afety and operating practices at a nuclear production facility are ... highly specialized matters not within the province of an ordinary juror"); Nat'l. Tel. Coop. Assoc. v. Exxon , 38 F.Supp.2d 1, 10 (D.C. 1998) (allowing standard of care expert in environmental contamination case where the issues are "so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.").
Additionally, in similar cases defendants have filed summary judgment motions where a plaintiff does not proffer an expert opinion mat establishes the applicable duty of care to provide a basis for a jury to conclude whether or not a legal duty was breached. Betz , 2013 WL 392480, at *1, 2013 U.S. Dist. LEXIS 13290, at *3 (seeking summary judgment because "Plaintiffs do not have an expert opinion on the applicable standard of care"); In re: Yasmin & YAZ (Drospirenone) Marketing, Sales Practices & Prods. Liab. Litig. , 3:09-md-02100, MDL No. 2100, 2011 WL 6302287, at *12, 2011 U.S. Dist. LEXIS 145593, at *36-37 (S.D. Ill. Dec. 16, 2011) (finding that expert testimony on the standard of care in the pharmaceutical industry is appropriate "because of the complex nature of the process and procedures and the jury needs assistance understanding it"); O'Neal v. Dep't of Army , 852 F.Supp. 327, 335 (M.D. Pa. 1994) (finding for defendant because the plaintiff failed to offer testimony regarding the appropriate standard of care to which the defendant should have been held, while the government offered uncontradicted testimony that all toxic chemical handling was in accordance with then-existing industry standards in groundwater contamination case).
B. DuPont's Arguments Directed Toward All Of The Trial Plaintiffs' Experts
DuPont argues that the Trial Plaintiffs' expert witnesses should be precluded from offering testimony based on (1) the improper subject matter on which they seek to opine and (2) because their opinions are unreliable.
1. Subject Matter
DuPont claims that, unlike its expert witness' testimony, the Trial Plaintiffs' "experts' reports and testimony clearly show they have not been designated merely to talk about the 'state of knowledge/state of the art and standard of care issues falling within [their] respective area(s) of expertise,' but instead want to usurp the roles of both judge and jury."
*904 (DuPont's Reply at 4.) DuPont continues that the Trial Plaintiffs' experts opine on their characterization of DuPont's knowledge from reading uncomplicated historical documents and then measuring that conduct against various inapplicable standards, which is not helpful to the jury, and indeed, is misleading, confusing and cumulative of other evidence. This Court disagrees.
The historical documents to which DuPont refers include the factual record that contains evidence of DuPont's conduct that began over fifty years ago and involves well over a decade of complex litigation, millions of documents, hundreds of witnesses operating in dozens of different regulatory, scientific, and technical fields, including, among others, toxicology, epidemiology, risk assessment, medicine, occupational health, regulatory compliance, public health, and chemical industry practices and policies.
Indeed, this is the very same factual record that DuPont utilizes with its own expert witnesses so that they may identify and summarize the key facts and to help the jury understand DuPont's contention that it not only complied with all applicable industrial and scientific standards of care, but that it was proactive in that regard and demonstrated exemplary conduct throughout its entire history. As the Trial Plaintiffs highlight,
DuPont itself has expressly acknowledged in the context of prior C-8 drinking water contamination litigation that "[t]here is little doubt that ... whether DuPont's stewardship of PFOA was consistent with the industry's best practices, falls outside the 'everyday knowledge and experience of a lay juror" and that expert "testimony on the reasonableness of [DuPont's] conduct may be helpful to a jury in understanding otherwise complex issues." (Plaintiffs' Standard of Care Aff. Ex. L at 13.)
(Trial Pls.' Mem. in Opp. at 35.)
DuPont further noted:
[T]estimony on the reasonableness of a sophisticated manufacturer in its use and stewardship of an unregulated polyfluoromer chemical [C-8] within the framework of existing state and federal regulatory and remediation programs and the then-governing industry standards and best practices" derived from an expert's "specialized and technical knowledge, will assist the trier of fact in determining a highly complex and nuanced aspect of this case, and is the type of opinion testimony contemplated for submission to the jury under Rule 702 and Daubert ." (Id. Ex. L at 14-15 (emphasis added).)
Id. (emphasis removed).
DuPont offers the opinion of Thomas C. Voltaggio to support the following assertions:
"In the 1970s, 1980s and 1990s, without any regulatory requirements or actions, ... DuPont was proactive and implemented its own plan for environmental stewardship of PFOA. This included voluntarily communicating with regulatory agencies about PFOA ... and implementing a number of measures designed to substantially reduce exposure to PFOA in the workplace and in the community. DuPont took these actions despite recognition that available scientific literature on human health effects did not establish any causal connection to any human disease." (Expert Report of Thomas C. Voltaggio at 4; ECF No. 2807-7.)
"DuPont has voluntarily entered into agreements with regulatory agencies to study PFOA and to take extensive measures to reduce human exposure. The Company's *905 voluntary actions have been proactive and consistent with good stewardship and leadership principles." Id. at 5.
"DuPont's effluent discharges of PFOA at Washington Works have been lawful and permissible under applicable regulatory permits." Id. at 16,
"Since PFOA was not a hazardous waste within the meaning of [the Resource Conservation and Recovery Act of 1976, 42 U.S.C.A. § 6972 et seq. ("RCRA") ], no regulatory control for that compound was required, and DuPont had no regulatory or statutory requirement to identify PFOA as needing to meet RCRA requirements." Id. at 19
"DuPont exhibited a diligent process in working with [the United States Environmental Protection Agency ("EPA") ] under RCRA. Moreover, DuPont voluntarily provided information about PFOA and its presence in the environment at Washington Works even though PFOA was not regulated under RCRA. DuPont's actions were proactive, and demonstrated sound environmental stewardship practices with respect to PFOA." Id. at 22
"DuPont was proactive and much more active and diligent than the majority of companies in terms of devoting resources to understanding and furthering the available science regarding potential effects of PFOA on human health and the environment, implementing controls, and reducing exposures. Contemporaneous records demonstrate that DuPont has endeavored to apply the best science at its disposal to understand and minimize exposures to PFOA at the plant and in the community ... DuPont has shown leadership and gone beyond the regulatory requirements and the typical conduct of most companies in efforts to develop a safe environment for its workers and the community. DuPont's efforts are far more proactive than most of the companies with which I have dealt." Id. at 25.
"DuPont was also proactive in responding as new information was received relating to PFOA." Id. at 28.
"DuPont acted quickly, proactively, and beyond what was required under the regulations." Id. at 31.
"[T]he behavior exhibited by DuPont regarding PFOA is exemplary, and far better than most ... DuPont has gone beyond regulatory requirements with respect to PFOA ... and demonstrated leadership in voluntary commitments for global stewardship for PFOA, furthering scientific understanding of all aspects of the compound, and ..., took measures to reduce community exposure in the areas surrounding DuPont's Washington Works facility." Id. at 32-45
"DuPont was diligent in evaluating new information as it became available ... DuPont was proactive, and set very conservative guidance standards for PFOA exposures that had many levels of safety factors to protect against adverse health effects to humans." (Expert Report of Robert W. Rickard, Ph.D., D.A.B.T. at 5; ECF No. 2807-4.)
"DuPont proactively reviewed its guidance levels as additional information on potential health effects was received over the years" ... and "DuPont's communications to employees and public statements regarding the scientific studies on the potential health effects of PFOA have been well grounded in the science related to PFOA." Id. at 5-6.
Based on its experts' testimony and opinions, DuPont argues that the available evidence "shows that DuPont exhibited a proactive concern for safety in its use of PFOA at its Washington Works plant, consistently going beyond the regulatory requirements and the typical conduct of most *906 chemical companies." (DuPont's Mot. for Partial Summ. J. on Punitive Damages in the Bartlett and Wolf Cases at 1; ECF No. 2825.) According to DuPont, its proffered evidence is "undisputed" and shows:
DuPont had no knowledge or expectation based upon any of the animal studies, 3M's extensive research, and/or DuPont's own monitoring of its workers that there was any likelihood of any harm at the relatively low levels [of C-8] found outside the plant," and that "Trial Plaintiffs have no evidence of any state-of-the-art knowledge of any increased risk of any harm from low community levels of exposure."
Id. at 30.
The Trial Plaintiffs, however, have offered their corporate conduct expert witness testimony to dispute what DuPont contends is undisputed. The expert witnesses from both parties offer opinion testimony of the type contemplated for submission to the jury under Rule 702 and Daubert . Specifically, the parties' experts opine on DuPont's stewardship of C-8 within the framework of the then-governing industry standards, best practices, and the state and federal regulatory programs; deriving their opinions from their specialized and technical knowledge. which will assist the trier of fact. This is so even though DuPont's experts and the Trial Plaintiffs' experts come to differing conclusions based on review of the same available historical evidence and their assessment of the state of knowledge/state of the art on C-8 risks during the time in question. "[C]hallenges to the accuracy or import" of the evidence relied upon by an expert "bear on 'the weight of the evidence rather than on its admissibility.' " Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co. , 90 F.Supp.3d 746, 757 (S.D. Ohio 2015) (quoting In re Scrap Metal , 527 F.3d at 529-31 ).
2. Reliability
In its Motion, DuPont posits that the testimony and reports of Drs. Levy and Siegel and Mssrs. Petty and Amter should be excluded because they are unreliable. DuPont argues:
Trial Plaintiffs' proposed experts have all employed a virtually identical and equally unreliable "methodology." Namely, each bases his conclusions entirely on a select group of DuPont documents hand-picked and provided by plaintiffs' counsel to construct a self-serving chronology that forms the sole basis of [their] knowledge and opinions regarding DuPont's use and handling of PFOA.
(DuPont's Mot. at 2) ("reading uncomplicated historical documents (cherry picked by them/Plaintiffs' counsel)"). DuPont maintains further that "[a] simple review of self- or counsel-selected internal company documents, followed by narrative summaries of those documents, is not valid 'expert' testimony. Such 'opinions' go to the heart of the jury's task, and a jury is fully capable of reading the documents and drawing its own conclusions." Id. at 18 (citing as an example In re Prempro , 554 F.Supp.2d 871, 886 (E.D. Ark. 2008) ("If an expert does nothing more than read exhibits, is there really any point in her testifying as an expert?") ).
DuPont bolsters its position in its Reply, stating, inter alia:
The four experts' deposition testimony reveals that the collection of documents they reviewed, and upon which they relied, was sorely lacking. For example, during their depositions, all four admitted that they had not reviewed, and in some instances had never seen, certain key documents, such as (by way of example only): (a) the animal studies (which only showed adverse effects at *907 doses many orders of magnitude higher than the very low community exposure levels) that DuPont relied on as it was deciding what actions to take regarding C-8 through the years; (b) the [West Virginia Department of Environmental Protection ("WVDEP") C-8 Assessment of Toxicity Team ("CATT") report, where toxicologists, including ones from EPA, ATSDR, and WVDEP, set a C-8 screening level of 150 ppb at which no adverse health effects were expected from lifetime exposure in drinking water-more than two orders of magnitude higher than DuPont's internal guidance standard, and two to three orders of magnitude higher than any level that Bartlett or Wolf claims was ever in their drinking water-as well as other CATT-related documents; and (c) other government C-8 risk assessments, public statements by agencies, and related documents that contradict the testimony they seek to give.
(DuPont's Reply at 9) (citing Amter Dep. at 148, 150; Levy Dep. at 53, 106, 106-107; Siegel Dep. at 7; Petty Dep. at 156).
The Trial Plaintiffs respond that the suggestion that their experts "relied solely on the historical records received from counsel and did no independent investigation nor relied on any other materials is simply not true." (Trial Pls.' Mem. in Opp. at 45.) Additionally, the Trial Plaintiffs continue, in cases that have extensive factual records it is not surprising that experts rely upon counsel to provide the historic record relevant to their areas of inquiry. Last, the Trial Plaintiffs contend that a majority of DuPont's arguments go to the weight of the evidence not its admissibility. The Trial Plaintiffs' arguments are well taken.
First, a review of the Trial Plaintiffs' experts' reports and deposition testimony reflects that each conducted his own extensive investigation and review of relevant scientific, technical, and other literature relevant to his analysis, some involving extensive review of completely separate, independent databases and historic archives. The Trial Plaintiffs' experts do more than "read exhibits" cherry-picked by counsel.
As to the review of the historical record in this action, as discussed above, it spans decades and encompasses millions of documents. It is not uncommon in such situations that experts rely on counsel to provide the historic record relevant to their areas of inquiry. In any event, "critiques of an expert's evidence gathering techniques ... generally go to the weight of the evidence, not its admissibility." Little Hocking , 90 F.Supp.3d at 764 (S.D. Ohio 2015) (citing United States v. Stafford , 721 F.3d 380, 395 (6th Cir. 2013) ). As this Court noted in Little Hocking , DuPont's "charges of cherry-picking data" do not "undermine the reliability of [the expert's] methodology." Id. at 758. Similar to the experts the plaintiff utilized in Little Hocking , the experts Trial Plaintiffs rely upon in this case offer opinions that "rest[ ] on a complex web of interrelated and corroborating evidence in the record, and the data on which [they] rel[y] does not rest on only one data point at one point in time." Id.
Finally, DuPont's challenges the Trial Plaintiffs' experts' interpretation of certain toxicology studies, their failure to review of the CATT report, and any other government C-8 risk assessments, public statements by agencies, and related documents. These matters are appropriately addressed on cross examination. The fact that an expert focusses on one piece of information or fact over another within that data set does not mean that the opinions are automatically unreliable products of "cherry picking" data. Criticism of which facts were selected or relied upon "go to the *908 weight of [the] testimony, not its admissibility." Id. (stating that "when such differences in interpretation rest on rationale grounds-[it] is an issue more appropriately addressed on cross-examination"). This Court's "gatekeeper role ... is not intended to supplant the adversary system or the role of the jury; 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" evidence a party finds lacking. Wellman v. Norfolk & Western Ry. , 98 F.Supp.2d 919, 924 (S.D. Ohio 2000) (quoting Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ).
The Court concludes that the Trial Plaintiffs have met their burden of showing that their expert witnesses utilized a reliable methodology.
C. DuPont's Arguments Addressed To The Individual Experts
The Court next addresses DuPont's contentions that the Trial Plaintiffs' corporate conduct experts are not qualified, that their opinions will not assist the jury, and that even if the testimony is relevant, it is unfairly prejudicial, unnecessarily cumulative, or would mislead and confuse the jury.
1. Barry S. Levy, M.D., M.P.H.
The Trial Plaintiffs have submitted an expert report from Dr. Levy, ("Levy Report"; ECF No. 2702-4) and his deposition testimony ("Levy Dep."; ECF No. 2809-7).
a. Dr. Levy's Qualifications
Dr. Levy is an occupational and environmental health physician and epidemiologist with more than forty years of experience. Dr. Levy received his Bachelors of Science from Tufts College, his Masters in Public Health Degree from Harvard School of Public Health, and his Doctoral in Medicine from Cornell University Medical College. Dr. Levy is board-certified in both Internal Medicine and Occupational Medicine, and is licensed to practice medicine in Massachusetts and Connecticut. Dr. Levy completed his post-doctoral work in preventive medicine at the Centers for Disease Control, where he was also employed as a medical epidemiologist.
Dr. Levy has worked and published extensively in the areas of occupational and environmental health and medicine. In addition to editing numerous book chapters on the topic of public health, Dr. Levy has been the editor of one of the definitive treatises on occupational and environmental health, now in its sixth edition, Occupational and Environmental Health: Recognizing and Preventing Disease and Injury (Barry S. Levy et al. eds., New York: Oxford University Press, 6th ed. 2011). This treatise covers a wide range of topics central to occupational and environmental health including, inter alia , chapters regarding hazardous exposures in the form of chemical and biologic exposures, water contamination and wastewater treatment, the detection of occupational and environmental hazards both within the workforce and in special populations, and chapters on the role of epidemiology and toxicology as tools for assessing, detecting and preventing human health injuries due to occupational and environmental health hazards.
Dr. Levy has authored numerous book chapters regarding injuries that arise from a variety of toxic exposures including the adverse effects of organic solvents, pesticide poisoning, mercury poisoning, lead poisoning and carcinogens. Dr. Levy has also published many articles in peer reviewed journals on a variety of subjects related to toxic exposure, occupational medicine and environmental and public health safety in general. Additionally, Dr. Levy has written on the subject of the policies and standards implemented within *909 the fields of occupational and environmental health and safety, writing book chapters, editorials and peer reviewed articles on the subject matter.
Dr. Levy has provided consultation services to various national and international government and government-sponsored agencies, including the National Institute for Occupational Safety and Health, the Occupational Safety and Health Administration, the United States Environmental Protection Agency ("EPA"), the National Academy of Sciences, the National Birth Defects Center, the Unites States Agency for International Development, and for international organizations including both the World Health Organization and the World Bank.
Dr. Levy is affiliated with numerous academic and professional organizations in the field of public health, including his appointment as Director of Environmental and Occupational Health Program at Tufts University School of Medicine. In addition, he is a Fellow of the American College of Epidemiology, and has served in a variety of leadership positions for numerous professional organizations including, among others, as Editor for the American College of Occupational and Environmental Medicine. Dr. Levy is also a current member of numerous professional organizations devoted to the fields of occupational and environmental health and epidemiology.
Finally, Dr. Levy has specifically studied the toxic effects of C-8 on human health and the history and timing of DuPont's specific knowledge of those effects for more than seven years in the context of working with counsel for the Leach Class.
b. Dr. Levy's Opinions
The Trial Plaintiffs offer Dr. Levy as an expert to opine on the following:
In light of his vast knowledge and experience in the public and occupational/environmental health fields in general, and DuPont's knowledge and handling of C-8 health effects specifically, Plaintiffs have proffered Dr. Levy to provide opinions as to DuPont's compliance with "applicable standards of conduct," drawn and arising from a synthesis of "principles and standards of public health as well as occupational and environmental health," "ethical codes of conduct" applicable in those specific fields, and "duties and responsibilities affirmed by DuPont health officials" in those same fields.
(Trial Pls.' Mem. in Opp. at 13) (citing Levy Dep. at 91, 201-03, 231).
The Trial Plaintiffs highlight Dr. Levy's deposition testimony regarding his task:
As explained by Dr. Levy during his deposition, his intent was to review the actions taken by DuPont over time with respect to C-8 and to evaluate "how those actions deviated from applicable public health and related - that is occupational and environmental health - standards and codes of conduct." These standards were "standards and codes of conduct that I was familiar with from my decades of work as a physician, epidemiologist, public health specialist, occupational and environmental health specialist," including "ethical standards and codes of conduct related to public health and occupational and environmental health," and "standards and codes of conduct that they [DuPont] affirmed and stated that DuPont was following." "[T]hese standards and codes of conduct apply to all relevant entities....
Id. at 13-14 (citing Levy Dep. at 30-40).
The Levy Report indicates that it is directed toward addressing the extent to which DuPont's actions with C-8 "deviated from applicable public health and related standards of conduct." (Levy Report at 2.) In the Report, Dr. Levy provides the following overall opinions as to DuPont's *910 compliance with the applicable standards of care;
1. "DuPont failed to adequately inform its employees and consumers of drinking water about the health risks of C-8;"
2. "DuPont failed to adequately follow up on positive findings from animal studies and human epidemiology studies on C-8 risks/diseases;"
3. "DuPont failed to adequately monitor its employees who were exposed to C-8 for C-8 risks/diseases;" and
4. "DuPont misled government officials and the general public about the health and safety of C-8 and its presence in drinking water."
Id. at 36-39. Based on the foregoing, Dr. Levy concludes that DuPont deviated from applicable standards of care, because, "for decades DuPont's actions (and inaction) have not been compliant with principles and standards of public health as well as occupational and environmental health, ethical conduct, or even its own standards for reporting health risk information, thereby potentially placing those exposed to C-8 at an unnecessary increased risk of harm." Id. at 39.
c. DuPont's Arguments for Exclusion
DuPont argues that Dr. Levy is unqualified to offer expert opinions and testimony regarding the state of knowledge and standards of care applicable to DuPont's actions arising in the specific context of public and occupational health. DuPont contends that, "[a]lthough Dr. Levy is a physician, originally board certified in internal and preventive medicine, the 'vast majority' of his income over the past several years has come from consulting work, primarily for plaintiffs' lawyers, and typically in the areas of epidemiology or occupational medicine." (DuPont's Mot. at 3.)
Further, DuPont states, "Dr. Levy has no prior experience with PFOA, never worked in the chemical industry (aside from two brief occupational health consulting projects long ago in unrelated areas to the present issues) or for any regulatory body, and he has no direct experience outside the courtroom with the relevant reporting obligations, industry standards, or regulatory compliance. Id. at 4-5. DuPont adds that Dr. Levy also is not trained as a historian, has never been to DuPont's Washington Works plant or spoken to any fact witnesses involved with PFOA issues, and is generally unaware of the products and chemicals used at the plant. Id. at 11-13. DuPont concludes that courts regularly exclude experts as unqualified "where[, as does Dr. Levy,] they attempt to opine on corporate compliance with alleged ethical or industry standards, while admitting that they lack any real-world, non-litigation experience with the company, product, or industry at issue." Id. at 11 (citing to In re Heparin Prod. Liab. Litig. , MDL No. 1953, Case No. 1:08hc600000, 2011 WL 1059660, 2011 U.S. Dist. LEXIS 36299 (N.D. Ohio Mar. 21, 2011) ). DuPont's arguments are not well taken.
First, Dr. Levy is not merely a physician who had a brief period of exposure to the chemical and occupational health industry as DuPont asserts. A cursory review of his qualifications listed above belie this assertion. In addition to his extensive experience and education in the area of public and occupational health, Dr. Levy has authored and edited prolifically in the areas of hazardous exposures in the form of chemical and biological, water contamination and wastewater treatment, the detection of occupational and environmental hazard, toxic exposure, occupational medicine and environmental and public health safety in general, and policies and standards implemented within the fields of occupational and environmental health *911 safety. He is qualified to opine on the standards of care applicable to these fields.
Second, while historians are often helpful to offer testimony that requires a historical review of documents, the Court finds that the fact that Dr. Levy is not a historian does not subtract from his qualifications to offer his opinions as to the state of knowledge and standards of conduct existing within the fields of public and occupational health, environmental contexts, and industry and regulatory standards and practices. The issues presented in the Bartlett and Wolf trials require not only an ability to review an extensive factual record, but also the ability to interpret the meaning of the documents that make up the record, which includes numerous epidemiological, toxicological, and scientific studies, in order for an opinion to be offered as to DuPont's conduct compared to the prevailing medical, scientific and/or industrial knowledge available to DuPont. Only with the type of specialized knowledge Dr. Levy possesses can an expert opine on DuPont's claim that it "neither knew, nor should have known, that any of the substances to which [the Trial Plaintiffs were] allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific and/or industrial knowledge available to DuPont at all times relevant to the claims or causes of action asserted by [the Trial Plaintiffs]." (DuPont's Answer to Bartlett Compl. ¶ 232.).
Further, as the Trial Plaintiffs correctly point out, the fact that Dr. Levy was never directly employed by DuPont, interviewed employees at DuPont, or was employed directly in a company that utilized C-8 does not disqualify his proffered opinions. Experts are permitted wide latitude in formulating their opinions, Daubert , 509 U.S. at 592, 113 S.Ct. 2786 ; Jahn , 233 F.3d at 388. An expert may base his or her opinion on information not personally possessed. Walker v. Soo Line R. Co. , 208 F.3d 581, 588 (7th Cir. 2000) ("[C]ourts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable.") (gathering cases); Buck v. Ford Motor Co. , 810 F.Supp.2d 815, 844 (N.D. Ohio 2011) (citing Ohio Envt'l Dev. Ltd. P'ship v. Envirotest Sys. Corp. , 478 F.Supp.2d 963, 976 (N.D. Ohio 2007) ("[A]n expert's testimony may be formulated by the use of the facts, data and conclusions of other experts.") ).
Moreover, contrary to DuPont's suggestion, Dr. Levy does not "admit[ ] that [he] lack[s] any real-world, non-litigation experience with the company, product, or industry at issue." (DuPont's Mot. at 11.) The expert in the case upon which DuPont relies in this regard is easily distinguished. The In re Heparin Products Liability Litigation plaintiff offered expert opinion on pharmaceutical drugs in general, Heparin API in particular, as well as API manufacturing, testing, and quality control. 2011 WL 1059660 at 10, 2011 U.S. Dist. LEXIS 36299 at 27-28. The court found the expert unqualified. The proposed expert had no experience in any of the subject areas on which he proposed to opine. His prior work was in "third-party inspection and sourcing services to American companies in a variety of industries, including auto parts, home and garden supplies, personal care and beauty products, diamonds, toys, clothing, architectural hardware and construction supplies." Id. at *9, 2011 U.S. Dist. LEXIS 36299 at *24. Dr. Levy's background in the areas upon which he opines is not remotely similar.
Finally, the Court is not persuaded that Dr. Levy's opinions are suspect because the vast majority of his income over the *912 past several years has come from consulting work, primarily for plaintiffs' lawyers. Initially, the source of his income from testifying may be used in cross-examination. DuPont's contention ignores Dr. Levy's prior thirty-five years of experience in the relevant fields. Dr. Levy is unlike the experts who have been found unqualified "hired guns." In Johnson v. Manitowoc Boom Trucks, Inc. , 484 F.3d 426, 435 (6th Cir. 2007), the court excluded an expert whom it found "in many ways to be the quintessential expert for hire" because he had "spent the last twenty plus years of his life testifying as an expert in a wide variety of design defect cases" and had only vague "familiarity with the particular type of machine in question." In addition, even if Dr. Levy's opinion could be considered litigation driven, that "by itself ... does not justify that expert's exclusion." Sanchez , 2014 WL 4851989, at 4, 2014 U.S. Dist. LEXIS 137189, at 11 (citing Daubert v. Merrell Dow Pharms., Inc. ("Daubert II "), 43 F.3d 1311, 1317 (9th Cir. 1995) ). As long as Dr. Levy's "research comports with the dictates of good science," which the Court finds that it does, it is not excludable on the basis that it arose during litigation. Id. (citing Daubert II , 43 F.3d at 1317 ).
The Court concludes that the Trial Plaintiffs have met their burden to show that Dr. Levy is qualified to testify as an expert on the subject matter on which his opinions and testimony are based and that his testimony will assist the jury, while not usurping its role. Additionally, the Court does not find Dr. Levy's testimony creates a danger of unfair prejudice, confusion of the issues, misleading of the jury, or needless presentation of cumulative evidence that would warrant exclusion under Federal Rule of Evidence 403.
2. Michael B. Siegel, M.D., M.P.H.
The Trial Plaintiffs have offered Dr. Siegel's expert report (Siegel Report," ECF No. 2702-5) and his deposition testimony ("Siegel Dep.", ECF No. 2809-10).
a. Dr. Siegel's Qualifications
The Trial Plaintiffs summarize Dr. Siegel's qualifications and the subject matter of his opinions as follows:
Plaintiffs are proffering a similarly well-respected and highly-credentialed epidemiologist, public health specialist, and medical doctor, Dr. Michael Siegel. to offer expert opinions and testimony regarding state of knowledge and standards of care applicable to DuPont's actions arising from commonly-accepted principles and standards of basic epidemiologic analysis, environmental risk analysis and health hazard assessment, causal inference, and carcinogen analysis.
(Trial Pls.' Mem. in Opp. at 9.)
Dr. Siegel has written books and numerous articles in the fields of public health, preventive medicine and epidemiology, focusing his research on the ability of corporate advertising and marketing to impact human health. Dr. Siegel has focused much of his research investigating the efforts of the tobacco industry to influence public consumption and opinion on smoking, as well as the appropriate legislative and public health response to smoking. Dr. Siegel was a recognized expert in the Engle[2] tobacco litigation and was allowed by several *913 courts to provide opinions on what the tobacco industry knew or should have known, based on his review of internal documents, government reports, and published literature. Dr. Siegel contends that he has acquired special experience and skill in reviewing such records, making him among the select group of "people who have experience with these documents, who understand corporate behavior, who understand corporate responsibility." (Trial Pls.' Mem. in Opp. at 18) (citing Siegel Dep. at 209).
The Siegel Report addresses the "generally accepted principles in evaluations human carcinogenicity based on evidence of animal carcinogenicity." (Siegel Report at 18.) As to the other standards upon which he relies to compare DuPont's conduct, the Trial Plaintiffs state:
With regard to the standard of care, Dr. Siegel explained during his deposition that his opinions are meant to address "whether or not DuPont followed a reasonable duty of care based on the - the duty to protect the public's health, based on my experience in working in the field of public health as well as occupational and environmental health." Dr. Siegel further explained that, by "duty of care," he is referring to "the standard of care" applicable at the time. The standard of care "comes out of the entire occupational and environmental health literature. There's innumerable documents, books, texts, articles that are - have been written about protecting the occupational and environmental safety."
(Trial Pls.' Mem. in Opp. at 17) (citing Siegel Report at 1-13, 22-26 and Siegel Dep. at 39, 51, 213, 214, 246, 273-75.)
b. Dr. Siegel's Opinions
Dr. Siegel states in his Report:
In articulating my opinion on whether DuPont was negligent in its actions, I am using the following definition of negligence. I am considering negligence to be the failure to take actions that a reasonable company, with a reasonable level of concern about the health and safety of its community, would have taken in the same situation. I am not using as a standard a company that I would consider to be an exemplary company, a good corporate citizen, or a company with a strong sense of social responsibility. I am instead using as a standard the lowest common denominator, or the minimum level at which I would expect a company to act if it has a reasonable degree of concern for the health of its surrounding community. Thus, my analysis considers a general duty of care that any company would be expected to fulfill.
(Siegel Report at 22.)
Dr. Siegel then offers his opinions within the framework of "five level[s] of negligence" ranging from negligent to negligent "at the highest level." (Siegel Report at 22-23.) Dr. Siegel's opinions offered within this framework spans five single-spaced pages which, for this Court's current purpose, can be assessed with the following summary:
"Starting in 1984, DuPont acted negligently by not informing public water authorities and the public that C-8 was present in drinking water supplies[.]"
"Beginning in 1989, and continuing until January 2002, DuPont acted at a higher level of negligence, as it was then aware that C-8 detected in water taps ... were as high as 2.2 ppb[.]"
"Starting in 1993, and continuing until January 2002, DuPont acted at an even higher level of negligence in failing to publicly disclose the contamination of the water supply[.]"
*914 "Beginning in 1998, and intensifying through 2010, DuPont acted negligently by violating established scientific standards in interpreting the results of C-8 health studies, manipulating its health standards for liability reasons, and deviating from scientific principles in order to protect itself."
"Beginning in 2000, and continuing until at least 2010, DuPont acted negligently at the highest level by proactively seeking to undermine the public's appreciation of potential human effects of C-8 by issuing public statements denying that C-8 has any adverse human health effects or even that it is an environmental pollutant."
(Siegel Report at 22 - 26.)
In his deposition, Dr. Siegel also opines on certain conduct of DuPont's that he believes is "fraudulent." (Siegel Dep. at 193) ("I believe [DuPont] knew [those public statements] were fraudulent .").
c. DuPont's Request for Exclusion
DuPont moves to exclude Dr. Siegel's testimony in its entirety because it, inter alia , speculates about DuPont's motive, intent, and/or state of mind and makes legal conclusions that should be reserved for the jury. Further, DuPont contends that the testimony is unfairly prejudicial, and would mislead or cause confusion to the jury. The Court agrees that a significant portion of Dr. Siegel's testimony is excludable.
First, in Dr. Siegel's testimony and his report he speculates as to DuPont's motives, which is not permitted. By way of example, Dr. Siegel testified that DuPont's "actions speak to a ... concerted effort to try to cover something up .... And I think it would be hard to explain that kind of behavior unless they actually were seriously concerned that this was causing harm." (Siegel Dep at 131.) In essence, Dr. Siegel has drawn inferences. While a witness may testify as to facts and an expert as to opinions, only a jury may draw inferences.
The Court also agrees with DuPont that Dr. Siegel's use the five-tiered negligence framework is inadmissible as are his references to DuPont's purported fraudulent conduct. Dr. Siegel admits he "personally came up with" the five-tiered standard and that it is "not based on any published criteria." (Siegel Dep. at 25.) And, although Dr. Siegel has clarified that he does not refer to negligence "in the legal sense," it is unlikely that a jury would appreciate the legal versus non-legal distinction. Dr. Siegel's testimony in this regard creates a danger of unfair prejudice, confusing the issues, and misleading the jury, and therefore, warrants exclusion under Federal Rule of Evidence 403. Dr. Siegel's testimony related to purported negligence and fraudulent activity also "usurp[s] ... the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it." See In re Rezulin , 309 F.Supp.2d at 547 (internal quotations and citations omitted); cf. United States v. Sheffey , 57 F.3d 1419, 1426 (6th Cir. 1995) ("The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate.").
The Court also excludes Dr. Siegel's opinions related to the "general duty of care that any company would be expected to fulfill." Dr. Siegel's opinions as to what he "would consider to be an exemplary company, a good corporate citizen, or a company with a strong sense of social responsibility ... the minimum level at which [he] would expect a company to act *915 if it has a reasonable degree of concern for the health of its surrounding community" are ones appropriate for a jury to determine. There is no special expertise necessary to make these determinations. To the extent that the Trial Plaintiffs argue that Dr. Siegel's knowledge of industry best practices informed his opinions on this good corporate citizen standard, it is not well taken. Dr. Siegel may have acquired special experience and skill in reviewing corporate behavior in the tobacco industry, based on his research that focused on the efforts of the tobacco industry to influence public consumption and opinion on smoking, as well as the appropriate legislative and public health response to smoking. That experience does not equate equally here,
The Court finds that Dr. Siegel is qualified to opine on DuPont's conduct as it relates to the relevant applicable scientific standards such as the "generally accepted principles in evaluations human carcinogenicity based on evidence of animal carcinogenicity." (Siegel Report at 18.) Some of Dr. Siegel's statements within the extensive five-tiered negligence analysis, when limited, are not excludable. By way of example, the Court considers the following opinion:
Beginning in 1998, and intensifying through 2010, DuPont acted negligently by violating established scientific standards in interpreting the results of C-8 health studies, manipulating its health standards for liability reasons, and deviating from scientific principles in order to protect itself.
(Siegel Report at 25.)
In this statement, Dr. Siegel not only improperly opines as to DuPont's negligence (as discussed supra ), but he also addressed DuPont's motives and/or state of mind. While Dr. Siegel can properly state that it is his opinion that DuPont manipulated its stated health standards, he cannot add his opinion as to DuPont's motive for doing so, i.e. , to avoid liability. It is for a jury to infer, or not to infer, whether DuPont took certain actions to avoid liability. And, while Dr. Siegel can state that it is his opinion that DuPont deviated from the prevailing scientific principles, he cannot add his judgment that DuPont did so to protect itself. Again, DuPont's motive for its action is for a jury to determine. Thus, when the offending portions are removed, the opinion is one based on Dr. Siegel's comparison of DuPont's actions to the relevant scientific standards, which his report has sufficient scientific data and analysis to support:
DuPont violated established scientific standards in interpreting the results of C-8 health studies, manipulating its health standards and deviating from scientific principles.
The Court therefore concludes that the Trial Plaintiffs have not met their burden to show that Dr. Siegel is qualified to testify as to the standard of care applicable to chemical corporations in general, to DuPont's motives behind its actions, or to whether DuPont's actions were negligent or fraudulent. Additionally, the Court finds that Dr. Siegel's testimony regarding DuPont's purported negligent and fraudulent conduct creates a danger of unfair prejudice, confusion the issues, and misleading of the jury, and therefore, warrants exclusion under Federal Rule of Evidence 403. On the other hand, the Trial Plaintiffs have sufficiently shown that Dr. Siegel is qualified to testify as to the prevailing state of the medical and scientific knowledge and the standards of care existing within these fields, and to compare DuPont's compliance with or deviation from those standards.
*916 3. Stephen E. Petty, P.E., C.I.H., C.S.P.
The Trial Plaintiffs offer the expert report of Mr. Petty ("Petty Report"; ECF No. 2702-1) and his deposition testimony ("Petty Dep."; ECF No. 3066-2).
a. Mr. Petty's Qualifications
Mr. Petty is a chemical engineer with experience in industrial health and safety, forensic engineering, and environmental engineering, Mr. Petty is a certified Professional Engineer, registered in Kentucky, Ohio, Pennsylvania, Texas, and West Virginia, a Certified Industrial Hygienist, and a Certified Safety Professional. Mr. Petty is a member of numerous professional organizations, including, among others, the American Institute of Chemical Engineers, Sigma Xi, American Industrial Hygiene Association, and the American Conference of Governmental Industrial Hygienists. Mr. Petty is currently the President of Engineering & Environmental Services, Inc., an engineering consulting firm that he founded in 2002.
For over three decades, Mr. Petty has provided chemical engineering and environmental consulting services in both the private and public sectors. In the public sector he has provided environmental engineering experience to several different government agencies, including the United States Environmental Protection Agency ("EPA"), the United States Coast Guard, NASA, and local state agencies as well. Additionally, Mr. Petty has worked on over a dozen projects for the EPA, including a project that involved identifying waste disposal practices, data which ultimately was used to determine the EPA's National Priorities List of Superfund cleanup sites. Mr. Petty's work for the Coast Guard involved creating a Chemical Hazards Risk Information System, known as the CHRIS database, which was a precursor to today's Material Safety Data Sheets.
In the private sector, Mr. Petty has provided chemical engineering consultation to numerous industrial clients, assisting them obtaining and complying with federal and state air, water, and hazardous waste permits. Mr. Petty has undertaken large-scale chemical engineering projects, including, among others, the design and development of a 200-million gallons-per-day wastewater treatment plant for a paper mill, and the development of a carbon treatment system designed for removing organophosphates and chlorinated thioether and nerve agents from wastewater. Additionally, Mr. Petty has consulted with chemical manufacturers, including 3M, developing and designing a large chemical manufacturing process. Mr. Petty also holds nine patents.
In recent years, Mr. Petty has published in the peer reviewed journal, International Journal for Occupational Environmental Health , regarding chemical exposures to benzene and vinyl chloride propellant. Mr. Petty has also published numerous reports over the years for the United States Department of Energy and the EPA, including reports regarding the physical chemical properties of hazardous waste, identification of hazardous waste disposal sites and the management of those sites, and reports examining different modalities for treating hazardous wastewater. Numerous federal courts have found that Mr. Petty qualified to provide expert opinion on the standards of care in cases involving exposures to organic chemicals, inorganic chemicals, mold, and bacteria.
b. Mr. Petty's Opinions
The Trial Plaintiffs proffer Mr. Petty to opine on DuPont's knowledge of and compliance with applicable standards of care with respect to C-8. Mr. Petty evaluated *917 DuPont's historic conduct with regard to standards of care that he identified as arising from chemical "industry standards and best practices," DuPont's "own internal standards and policies," and "governmental codes and standards." (Petty Dep. at 28, 26; Petty Report at 82.) Mr. Petty testified that his "primary scope was to look at the standard of care as to how DuPont behaved with respect to information [it] had against both [its] internal standards, industry best practices, and codes." (Petty Dep. at 10-11.) In summary, Mr. Petty opines that DuPont did not comply with such "standards of care/conduct," considering what it knew about the nature, extent, and significance of C-8 as to its employees, the public, governmental agencies, and the environment. (Petty Report at 82.)
c. DuPont's Request to Exclude
DuPont argues that Mr. Petty lacks the requisite skills, training, and experience to offer opinions related to DuPont's internal policies, industry standards, and government codes because he "[h]as no prior experience with PFOA, has never been directly employed in the chemical industry or by any federal, West Virginia, or Ohio agency, and has never spoken to any current or former DuPont employees, or any other fact witnesses about issues relating to PFOA"; "[h]as never been responsible for setting human health guidelines"; "[h]as not looked into whether any other chemical companies set acceptable exposure limits for PFOA in the way DuPont did"; and "[h]as not spoken to anyone at the US EPA, Ohio EPA, or the West Virginia Department of Environmental Protection ... about the PFOA issues relevant to this matter." (DuPont's Mot. at 14.) DuPont further contends that Mr. Petty offers improper legal conclusions accusing DuPont of violating the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act (RCRA). (DuPont's Mot. at 23-24.) DuPont's arguments are not well taken.
First, as to Mr. Petty's qualifications, the Court disagrees with DuPont's assessment that he has not been employed in the chemical industry. Mr. Petty spent decades assisting a variety of industrial clients relating to chemical waste, has undertaken large-scale chemical engineering projects and has consulted with chemical manufacturers, including 3M, the manufacturer of the C-8 used by DuPont.
Second, for the same reasons the Court explained with regard to Dr. Levy, it is not necessary to be employed by DuPont or consult with any of its employees to be qualified as an expert here. The fact that Dr, Levy was not employed by DuPont and did not speak to its employees does not subtract from his wealth of experience, skills and knowledge in the subject area of his opinions.
Third, DuPont's complaint that Mr. Petty has not utilized certain guidelines or contacted other chemical companies or governmental agencies about C-8 go to the weight of his testimony, not its admissibility. "[C]ritiques of an expert's evidence gathering techniques ... generally go to the weight of the evidence, not its admissibility." Little Hocking , 90 F.Supp.3d at 764 (citing United States v. Stafford , 721 F.3d 380, 395 (6th Cir. 2013) ).
Fourth, DuPont's argument that Mr. Petty offers legal conclusions related to the TSCA and RCRA has been expressly rejected in a related C-8 case before this Court. The Little Hocking court rejected DuPont's argument that the plaintiffs expert was offering an improper legal opinion when opining on the TSCA and the RCRA. He uses the same "imminent substantial endangerment" language in his report that is used in an applicable RCRA legal standard. Nonetheless, as found in *918 Little Hocking, such term is also a scientific term properly used in his analysis. Little Hocking , 90 F.Supp.3d at 765-66. For these same reasons, this Court rejects DuPont's argument here. The weight given to the 2004 EPA suit may be appropriately explored on cross examination.
The Court, therefore, concludes that the Trial Plaintiffs have met their burden of showing that Mr. Petty is qualified to offer the proffered opinions, and that his testimony will assist the jury. The Court, however, imposes limits on Mr. Perry's testimony.
DuPont correctly points out that Mr. Petty at times "speculates concerning DuPont's state of mind, motives, and intent (sometimes using inflammatory and unfairly prejudicial language to do so)[.]" (DuPont's Mot. at 24.) As an example, DuPont presents Mr, Petty's statement that "[b]ased on timing, it would appear that DuPont was attempting to discredit the laboratory studies." (Petty Report at 7.) Mr. Petty is prohibited from offering an opinion on the motive behind DuPont's actions for the same reasons the Court explained above regarding Dr. Siegel.
With regard to inflammatory language, DuPont points out that Mr. Petty testified that "DuPont's arrogance is palpable" and that "you don't wait till you have ... lines of bodies in the ditch before you start to take action on a chemical." (Petty Dep at 38, 80). This language is inflammatory and the Court finds that its probative value is substantially outweighed by a danger of unfair prejudice.
4. Steven Amter, U.S., M.S.
The Trial Plaintiffs offer the expert report of Mr. Amter ("Amter Report"; ECF No. 2702-2) and his deposition testimony ("Amter Dep."; ECF No. 3066-3).
a. Mr. Amter's Qualifications
Mr. Amter holds a Bachelor of Science Degree in Geology and a Master of Science Degree in Hydrology and Water Resources. In the 1980s Mr. Amter worked as an environmental scientist and hydrogeologist at the Environmental Protection Bureau of New York State Law Department. As a scientist of this Department, he participated in designing and conducting environmental, soil, and groundwater monitoring investigations at various sites. Mr. Amter also worked with companies that were undertaking investigations and remediation clean-ups at their sites. Mr. Amter has conducted research to develop new methods for sampling contaminated soil water.
In 1987, Mr. Amter founded the environmental consulting firm, Disposal Safety Incorporated, where he is currently the President and Senior Researcher. Through this firm, Mr, Amter has analyzed and reviewed hundreds of sites contaminated by chemical and radioactive wastes and conducted in-depth evaluations of more than a dozen Superfund investigations and remediations. In addition, Mr. Amter has served as community technical advisor at multiple Superfund sites, municipal sites, and at sites governed by RCRA.
Mr. Amter has published several scientific articles on a variety of subjects regarding environmental contamination. His published works include research regarding state and federal regulations and standards governing chemical wastes and groundwater, scientific research related to the detection of chemical contaminants in both the air and water, and specific articles related to the contamination of groundwater with the chemical trichlorethene. Mr. Amter also has co-authored a book that documents the history of the chemical industry and its historical response to government regulations in the *919 face of concerns regarding human safety and the integrity of the environment. This book includes a chapter devoted to a historical analysis of DuPont's actions beginning in the 1930s.
Mr. Amter, through his Washington, D.C. based firm, has provided expert opinion in a variety of environmental contamination cases on behalf of both private attorneys and governmental agencies, including the United States Department of Justice. Numerous state and federal courts have permitted Mr. Amter to provide expert testimony regarding relevant standards of care in preventing or responding to environmental pollution, including the standard of care with respect to waste management to prevent environmental contamination in the chemical, petroleum, aerospace, electronics, metal fabrication, and smelting industries.
b. Mr. Amter's Opinions
The Trial Plaintiffs asset that they offer the testimony of Mr. Amter, "a well-respected and highly-credentialed environmental engineer/scientist and published historian on chemical industry knowledge of and standards governing environmental pollutants to address DuPont's historic knowledge of C-8 pollution and health risks and DuPont's compliance with applicable chemical industry standards of care." (Opp. at 9.) On those issues, Mr. Amter opines:
The standard of care in the chemical industry has been to proactively protect one's neighbors and properly manage one's waste. Generators and users of toxic chemicals, like DuPont, have had the responsibility to prevent, or abate as quickly as possible, threats to the health and property of their residential neighbors. This responsibility was recognized by the public and industry in general, trade groups. regulators, and technical organizations, and affirmed by the chemical industry through its good neighbor and responsible care policies.
(Amter Dep. 147 - 56, 238; Amter Report at 6) (describing the process and various bases for identifying and defining the applicable standard of care in a given context including "guidance and standards in the chemical industry")
After reviewing and summarizing the history of DuPont's state of knowledge as to C-8 in this context, Mr. Amter opines that DuPont did not comply with this standard of care, because, in summary, DuPont "discharged vast quantities of C-8 into the environment around the Washington Works plant resulting in contamination of area drinking water supplies" and "failed to disclose the contamination to regulators and those exposed to the contaminated drinking water," "despite early (1950s and 1970s) concerns about 1) danger to groundwater, 2) environmental persistence, 3) toxicity and biopersistence, 4) landfilling, and 5) risks to employees." (Amter Dep. at 75-79, 178, 230-31, 314-15.) In performing this standard of care analysis, Mr. Amter followed the "generally accepted method" that he has followed for "[a]t least twenty" years and that "others that provide opinions on standard of care in the industry follow," to "identify applicable standard of care and then evaluate[ ] DuPont's actions, inactions, and conduct in relation to that standard of care." (Amter Dep. at 314-18; Amter Report at 4.)
c. DuPont's Request to Exclude
DuPont moves to exclude Mr. Amter's testimony, arguing that he "has no prior, non-litigation work experience with PFOA, and he has never worked for a chemical company, any federal regulatory agency, or any state agency in West Virginia or Ohio"; "He has never been to the Washington Works plant or the surrounding area"; and, "More than 80% of his *920 litigation work is for lawyers representing plaintiffs, and he has worked on several matters for" a firm that represents a number of plaintiffs in this MDL. (DuPont's Mot. at 9.) DuPont's arguments are not well taken.
Mr. Amter has spent more than three decades working in both the private and public sectors as a scientist and investigator of environmental contamination, including some of the largest projects in American history. Mr. Amter's knowledge and experience regarding the chemical industry has been recognized by numerous state and federal courts, which have permitted Mr, Amter to provide expert testimony regarding relevant standards of care in preventing or responding to environmental pollution, including the standard of care with respect to waste management to prevent environmental contamination in the chemical, petroleum, aerospace, electronics, metal fabrication, and smelting industries. Mr. Amter has offered expert opinions, either exclusively or in tandem with technical opinions on contamination at a specific site, on the history of pollution, waste management practices, and the relevant standard of care in eighteen such cases, including several involving groundwater contaminated by chlorinated or halogenated solvent chemicals.
The Court concludes that the Trial Plaintiffs have met their burden to show that Mr. Amter is qualified to testify to the topics on which he opines and his testimony and opinions will be helpful to the jury. Additionally, the Court does not find Mr. Amter's testimony creates a danger of "unfair prejudice, confusing the issues, misleading the jury, ... or needlessly presenting cumulative evidence" such that would warrant exclusion under Federal Rule of Evidence 403.
IV.
For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART DuPont's Motion to Exclude Plaintiffs' Corporate Conduct Experts (ECF No. 2819), in accordance with this Opinion and Order.
IT IS SO ORDERED.

This case is "one of seven MDLs assigned to [United States District Judge Joseph R. Goodwin] by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse and stress urinary incontinence. In the seven MDLs, there are over 60,000 cases currently pending, over 13,000 of which are in the Boston Scientific Corporation MDL." Sanchez , 2014 WL 4851989, at *1, 2014 U.S. Dist. LEXIS 137189, at *3.

The Court refers to Engle v. Liggett Group, Inc. , 945 So.2d 1246, 1277 (Fla. 2006), where the court decertified a statewide class of smokers and their survivors, but allowed members of the decertified class one year in which to file individual lawsuits. For a detailed history of the Engle litigation, see Brown v. R.J. Reynolds Tobacco Co. , 611 F.3d 1324, 1326-29 (11th Cir. 2010) and Waggoner v. R.J. Reynolds Tobacco Co. , 835 F.Supp.2d 1244 (M.D. Fla. 2011).